**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **JANE DOE** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **BROWN UNIVERSITY** ) | |
| Providence, RI 02912 ) | |
| ) | |
| **PHI KAPPA PSI, INC.** ) | |
| 5395 Emerson Way ) | |
| Indianapolis, Indiana 46226 ) | |
| ) | |
| **PHI KAPPA PSI – RHODE ISLAND** ) | |
| **ALPHA CHAPTER** ) | |
| Brown University ) | **Case No. _____** |
| 69 Brown Street ) | |
| Providence, RI 02912 ) | |
| ) | |
| **JOHN SMITH** ) | |
| ) | |
| **Defendants** ) | |
| ) | |

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MONETARY RELIEF
AND JURY DEMAND**

**PRELIMINARY STATEMENT AND INTRODUCTION**

1.      This is a civil action for declaratory, injunctive, and monetary relief for injuries

that Plaintiff Jane Doe sustained as a result of Defendant Brown University's deliberate

indifference to her right to be safe from campus sexual assault and from the serious threats posed

to female students by a University-recognized fraternity, Defendant Phi Kappa Psi – Rhode

Island Alpha Chapter ("Phi Psi"), as well as its systemic failure to respond effectively to campus

sexual assaults, in violation the Educational Amendments of 1972 (Title IX), 20 U.S.C. § 1681 *et*

1

*seq.*  Despite the University's knowledge that sexual assault on its campus is endemic and that female students are routinely injured as a result of their attendance at fraternity parties at which under-aged students are routinely served potent alcoholic beverages, including, upon occasion, beverages spiked with date rape drugs, Brown failed to take effective preventative measures and allowed this dangerous situation to persist and cause harm to female students, including Ms. Doe.

2.      As detailed more fully below, as a result of Brown's derogation of its legal responsibilities, in the early morning hours of October 18, 2014, Plaintiff, then a junior at Brown University ("Brown" or "University"), ingested a beverage prepared by Defendant John Smith, a member of Phi Psi, at an unregistered fraternity party held on Brown's campus at the Phi Psi fraternity house.  After Ms. Doe and a female student who accompanied her to the party drank this beverage, they experienced various severe neurological and physical impairments, including periods of disorientation, memory loss, loss of balance and coordination, and an inability to speak or remain awake.  In this incapacitated state, a male student who was at the party, "Michael Jones," accompanied Ms. Doe from the party to her dormitory room, where he sexually assaulted her.

3.      After Ms. Doe reported to Brown University medical officers that she believed that she had been served a date rape drug at Phi Psi which rendered her unconscious and resulted in unwelcome sexual contact, the University engaged in a haphazard collection of evidence and a careless investigation into the events that demonstrated deliberate indifference to her rights under Title IX.  The University took blood and urine specimens from her and sent them to a laboratory operated by Lifespan, which lacked the ability to perform the industry-standard "date rape drug"

toxicology analysis or to otherwise meet the requisite requirements of forensic evidence handling.

4.      Ultimately, upon threat of legal action by Defendant Smith, the son of a Brown University trustee, and further analysis by the University of the negligent work performed by Lifespan, the University threw out laboratory results indicating that Ms. Doe had been served GHB at the fraternity party.  Thereafter, it halted all disciplinary action against Defendant Smith despite his admission and the testimony of other witnesses that he was the brainchild of the unregistered party, had in fact purchased the alcohol, and had served an alcoholic beverage he made specially for Ms. Doe and her companion, which incapacitated both women.

5.      In a further improper effort to protect Defendant Smith and insulate him from disciplinary proceedings, University officials refused to accept documentary evidence brought to the attention of Associate Dean for Student Life Yolanda Castillo-Appollonio and Student Support Dean Ashley Ferranti that Defendant Smith was conducting a false identification procurement business at Brown to facilitate the purchase of alcohol for students under the age of 21.  Brown officials refused to accept evidence that Defendant Smith was doing so from his University housing and using his University mailbox for this illegal purpose, purchasing false identification manufactured in Malaysia and shipped from Taiwan using U.S. mail services, in violation of federal law.

6.      Despite strong evidence that Ms. Doe and her friend were served an adulterated beverage by Defendant Smith and that the drugging facilitated Ms. Doe's sexual assault later that night, Brown only imposed weak sanctions against Phi Psi and dropped all charges against Defendant Smith prior to an investigatory hearing.

7.     Defendants Phi Psi and Smith were emboldened by the University's decision not to pursue charges against Smith and to reduce the sanctions initially imposed on the fraternity, and retaliated against Ms. Doe by, *inter alia*, distributing leaflets that portrayed themselves as victims and referred to private facts about Ms. Doe, congregating together as a fraternity in violation of Brown University's sanction order in a manner intimidating to Ms. Doe, and further contributing to a sexually hostile environment for Ms. Doe and other female students.

8.     As a result of Brown University's reckless practices, flawed investigation into Ms. Doe's allegations, and deliberate indifference to her Title IX rights, Ms. Doe suffered the physical and emotional harm of being served an adulterated drink by Defendant Smith and sexually assaulted by another student, and the sexually hostile and retaliatory environment that ensued in the wake of her complaints against the fraternity and other responsible parties.  These actions were sufficiently serious to interfere with Ms. Doe's ability to participate in and enjoy the full benefit of the educational services and opportunities afforded by Brown University.

9.     In further retaliation for Ms. Doe's assertion of her Title IX rights, Brown University denied Ms. Doe an interview to its medical school despite the fact that she was one of the top students in her class and received offers of admission at the nation's top medical schools, including Harvard University, Stanford University, and seven others.  Brown University's medical school, which is ranked lower than nearly all of the schools that interviewed and accepted Ms. Doe, refused to grant her an interview after purportedly engaging in a "careful review" of her record.

10.     This is also an action against Defendant Brown University for negligence, against Defendants Brown University and Phi Psi for premises liability, and against Defendants Phi

Kappa Psi, Inc, and its local chapter, Phi Psi, for negligence.  This is also an action against Defendant Smith for assault and battery.

## JURISDICTION

11.     This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (a)(1) because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

12.     Jurisdiction is also proper pursuant to 28 U.S.C. § 1331, because Plaintiff is raising a claim under, *inter alia*, the laws of the United States.

## PARTIES

13.     Plaintiff Jane Doe is 2016 graduate of Brown University and a resident of Washington, D.C.  At the time of the incidents described below, Ms. Doe was a junior at Brown enrolled in the Biochemistry concentration, though the retaliation to which she was subjected after asserting her Title IX rights continued through her senior year.  Ms. Doe chose to attend Brown University after being accepted early admission because of its social justice focus and its representations about providing a close-knit, supportive campus environment where women can thrive.

14.     Defendant Brown University ("Brown" or "the University") is a private Ivy League university located in Providence, Rhode Island.  Brown is organized and operated under the laws of the State of Rhode Island and is a recipient of federal funds within the meaning of 20 U.S.C. § 1681 ("Title IX").  At all times relevant to this Complaint, Christina Paxson was the President of Brown University.

15.     Defendant John Smith is a student at Brown University and is a resident of New York.  At all times relevant to this Complaint, Smith was a sophomore and then a junior at

Brown and a member of Phi Kappa Psi.  Defendant Smith ran a false identification procurement business from his residence at Brown University, called "I'm 22 Bitch," which facilitated his purchase of alcohol for the unregistered fraternity party held at Phi Psi on October 17 and 18, 2014.

16.     Defendant Phi Kappa Psi, Inc. is a non-profit corporation, incorporated in the state of Indiana.

17.     Defendant Phi Kappa Psi - Rhode Island Alpha Chapter ("Phi Psi") is the Brown University chapter of the national fraternity Phi Kappa Psi, Inc.  At the relevant times, Phi Psi maintained Program Housing at Sears House on the campus of Brown University.  Upon information and belief, at all times relevant to this Complaint, Defendant Phi Psi was aware that Defendant Smith ran a false identification business from his fraternity housing for the purpose of facilitating the purchase of alcohol by students under the legal drinking age of 21.  At all times relevant hereto, Defendant Smith was an agent of Defendant Phi Psi.

## FACTUAL STATEMENT

**Brown University Was On Notice that Campus Sexual Assault Occurs More Often In Fraternity Settings at Which Alcohol is Served But Failed to Protect Students From This Known Risk.**

18.     Studies by the United States Department of Justice and research published in peer-reviewed journals establish that sexual assault is endemic on college campuses, with 19-25% of women experiencing attempted or completed sexual assault during their undergraduate experience.  Studies confirm that the most significant risk factor for campus sexual assault is the use of alcohol.  Nearly half of all sexual assaults are inflicted on women who had been drinking alcohol prior to being assaulted.  Fraternities pose another well-known risk factor for campus sexual assault of women, with fraternity members being statistically more likely than non-

members to commit assaults against female students.  Fraternity members are twice as likely to use incapacitation by alcohol or other substances to facilitate sexual assault of women rather than direct physical force.

19.     Brown University, through its official pronouncements, represents to its students that it is "committed" to providing them with a safe living space in an academically enriching environment and requires students to live on-campus for a minimum of six semesters.  There is widespread awareness on campus that fraternities host events at which alcohol is served to underage guests who are then vulnerable to being served substances causing impairment.  Women, in particular, are thus also rendered vulnerable to sexual assault.

20.     In the face of overwhelming evidence that alcohol use and the activities of fraternities increase the risk of sexual violence against female students, the University nevertheless chose to permit Phi Psi to operate self-governing housing, while choosing not to warn students -- in particular, female students who are most vulnerable to sexual assault and abuse -- of the risks thereby created.  Brown further chose to ignore its own rules requiring fraternities to register parties at which alcohol is served despite its knowledge that such parties were routinely held on its campus and in buildings owned by Brown University.

21.     Prior to the events at issue in this case, female students at Brown made numerous reports to University officials that they were rendered incapacitated by substances provided by other students, leaving them vulnerable to sexual assault, while on campus, including at fraternity parties.  Up to and through the handling of Ms. Doe's case, the University used the services of a medical laboratory to analyze specimens provided for drugging claims rather than a qualified forensic toxicology laboratory equipped to provide reliable analysis appropriate for evidentiary use, in deliberate indifference to the Title IX rights of female students.  As a result,

unreliable and inconclusive results with no evidentiary value have been produced for each case in which students have submitted specimens for testing.

### The Unregistered Phi Kappa Psi Event on October 17 and 18, 2014

22.     On October 17, 2014, and into the early morning hours of October 18, 2014, Phi Psi held an unregistered party in the basement of the Sears House, a University owned on-campus building that housed the Phi Psi fraternity.  Sears House is part of Program Housing offered by the University.  Program Housing is a system under which student organizations are authorized to administer "self-governing" housing for their members, with substantial supervision duties delegated to the student-run organizations.  At the time of the events at issue in this Complaint, Phi Psi had a record of repeated violations of the Student Code of Conduct and the laws of the state of Rhode Island related to the provision of alcohol to underage students and other misconduct at Sears House.  The fraternity had been sanctioned for misconduct earlier in 2014 and punished with the temporary suspension of all social activities.  This suspension ended just weeks before Phi Psi held the unregistered party on October 17 and 18, 2014.

23.     Defendant Smith, who was under 21 years of age at the time of the unauthorized party, was not legally permitted to purchase or consume alcohol.  Nonetheless, Defendant Smith advocated that the fraternity host an unregistered party on the night in question and purchased the alcohol for the party along with another member of the fraternity.  Upon information and belief, Defendant Smith and others at Phi Psi used false identification to purchase the alcohol served at the party through a business Defendant Smith operated from his campus housing that went by the name "I'm 22 Bitch."

24.     Defendant Smith along with members of Defendant Phi Psi mixed various fruit juices and Graves 95% proof grain alcohol to create a potent alcoholic punch to serve at the

party.  During the party, fraternity members, including Defendant Smith, acted as bartenders and provided cups of the alcoholic punch to guests without asking for identification to verify that they were legally permitted to consume alcohol.

25.     Ms. Doe and her friend, Mary Roe,[1] who was then a senior at Brown University, heard music coming from Sears House and arrived at the Phi Psi party shortly after 11:30 p.m. on October 17, 2014.  Prior to this evening, Ms. Doe had never attended a fraternity party.  Ms. Doe and Ms. Roe were alert, coherent, and in full control of their mental and physical capabilities at the time they arrived at Phi Psi.

26.     A short time after arriving at Phi Psi, Defendant Smith struck up a flirtatious conversation with Ms. Doe's companion, Ms. Roe.  When Defendant Smith tried to hand Ms. Roe a beverage she told him that she had numerous food allergies which she described to him and requested a drink that did not contain anything that she might react to.  Defendant Smith responded that he would make her a "special" drink.  Out of sight of Ms. Doe and Ms. Roe, Defendant Smith prepared a drink for Ms. Roe and handed it to her telling her that he had made the drink "special for you."

27.     With Defendant Smith looking on, Ms. Roe took a sip of the drink and handed it to Ms. Doe.  Ms. Doe sipped from the drink and then returned it to Ms. Roe, who finished it. Within minutes of consuming the beverage, Ms. Doe and Ms. Roe both experienced serious mental and physical reactions.  They each went into a dream-like, dissociative state and had unclear, intermittent memories of subsequent events.  Ms. Doe and Ms. Roe were unable to keep track of one another and became separated at the party.

---

[1] This is a pseudonym to protect Ms. Roe's privacy.

**Ms. Roe's Experience after Receiving the Drink from Defendant Smith**

28.     Multiple witnesses, including Defendant Smith and other members of Phi Psi,

observed that Ms. Roe was severely impaired after consuming the drink he had provided her, but

rendered no assistance to her.  Ms. Roe left the party alone around 12:38 a.m., and was

videotaped stumbling, swaying, and leaning on building walls for support as she struggled to

walk home.  When Ms. Roe arrived at home, her housemate, who was a certified Emergency

Medical Technician ("EMT"), noted her severe impairment.  He observed that Ms. Roe appeared

heavily sedated, was unable to stay awake during their short conversations, and did not exhibit

the normal indications of alcohol intoxication.

29.     Concerned about Ms. Roe's medical condition, the EMT took her vital signs and

observed that her breathing was somewhat rapid, a finding that was abnormal for alcohol

intoxication, which normally suppresses the breathing rate.  The EMT monitored Ms. Roe's vital

signs until approximately 2:30 a.m., and noted that her breathing rate remained elevated while

she slept.

**Ms. Doe's Experience after Receiving the Drink from Defendant Smith**

30.     After getting separated from Ms. Roe at the party, Ms. Doe encountered Michael

Jones,[2] a student she had met only once before earlier in the school year. He accompanied her

back to her dormitory room at approximately 12:30 a.m. on October 18, 2014.

31.     Ms. Doe, who has few memories of the events as a result of her incapacitation,

recalls stumbling as she walked towards the building, then struggling to place her key in the door

to her room.  Ms. Doe's only other flash memories were of Mr. Jones having sex with her while

---

[2] This is a pseudonym to protect Mr. Jones' privacy.

she was physically incapacitated.  Ms. Doe was unable to speak or move while the sexual

activity took place.

32.     Mr. Jones later testified in the context of a University disciplinary proceeding that

he recognized that Ms. Doe displayed physical indications of incapacitation after their sexual

encounter, but nonetheless had had sexual intercourse with her moments before without using a

condom.  After having sexual intercourse with Ms. Doe, Mr. Jones left her in her room, naked

and unconscious.

### Ms. Doe's Initial Medical Treatment after the Sexual Assault and Reports to the University Department of Public Safety

33.     Later in the morning on October 18, 2014, Ms. Doe and Ms. Roe both awoke with

almost no memories of the previous night.

34.     Ms. Doe had physical indications of sexual penetration but only fractured

memories of a sexual encounter with Mr. Jones during which she was unable to speak or move.

35.     Ms. Roe and Ms. Doe communicated on the morning of October 18, 2014,

sharing their impressions that they had ingested something other than alcohol in the beverage

provided by Defendant Smith, based on their reactions immediately after drinking it, their

subsequent memory loss, and lack of alcohol hangover symptoms following these events.  Both

feared that they had they had been served a drink that was laced with a date rape drug at Phi Psi.

36.     Because Ms. Doe had potentially been exposed to sexually transmitted diseases

("STDs") and believed that she had been drugged, she went to Brown University Health Services

("Health Services") to seek medical care.  Ms. Doe informed Dr. Marsha Miller, a staff physician

at Health Services, that she suspected she had been drugged at the fraternity party and requested

that she be tested for ingestion of date rape drugs.  At no time did Dr. Miller advise Ms. Doe that

Brown University and its agents were unable to provide her with the medical services she had requested.

37.     At Dr. Miller's direction, Ms. Doe provided blood and urine samples for drug testing with the understanding that the samples would be tested for the full range of date rape drugs.  In fact, Dr. Miller requested testing only for two substances, gamma-Hydroxybutyric acid ("GHB") and flunitrazepam (also known as Rohypnol or "roofies"), and not for any of the more commonly available sedatives, such as prescription anti-depressant, anti-anxiety, or sleeping medications, which are often used in drug-facilitated sexual assaults.  She did not request an analysis of Ms. Doe's blood alcohol level ("BAC").  Brown University sent Ms. Doe's blood and urine samples to the Rhode Island Hospital Toxicology Laboratory in Providence, Rhode Island, operated by Lifespan.

38.     Ms. Doe left Health Services and returned later that day with her father, who is a medical doctor.  On this second visit, Ms. Doe requested prophylactic treatment for HIV. Shockingly, Dr. Miller advised that treatment for STDs was not necessary because the risks of infection, including for HIV, were low on campus.  Ms. Doe's father, who practices in the area of infectious disease, urged Ms. Doe to get the full regimen of preventive treatment to avoid even a small risk of exposure.  Ms. Doe did so, and began a course of treatment immediately.

39.     On October 20, 2014, Ms. Doe and Ms. Roe told the Coordinator of Sexual Assault Prevention and Advocacy at Health Services, Bita Shooshani, that they wished to make a report that they had been drugged by a beverage provided to them by Defendant Smith at the Phi Psi party.  Shortly after making this report, Brown University Department of Public Safety ("DPS") officer Sergeant Carvalho met with Ms. Doe and Ms. Roe at Health Services and took initial statements from each of them.  Ms. Doe did not file a sexual assault report against Mr.

Jones at the time, preferring to keep the incident private while she tried to come to terms with the trauma of her sexual assault.

40.     On the evening on October 20, 2014, Ms. Doe contacted Sgt. Carvalho to confirm that the Phi Psi member who served her and Ms. Roe the spiked beverage at the party was John Smith.

41.     On October 24, 2014, Brown DPS issued a Community Notification to the student body stating that students had alleged that they had been drugged at a party at Sears House, and that the fraternity involved had been suspended during the investigation into the incident.

42.     As the days and weeks passed after the traumatic events of October 17 and 18, Ms. Doe experienced escalating levels of depression and debilitating anxiety about being in public on campus, where it was likely that she would encounter Mr. Jones, Defendant Smith, or other members of Phi Psi who were aware of the allegations she had made.  Ms. Doe stopped attending classes and was unable to engage in her normal routines or to otherwise enjoy the full benefits of the educational opportunities offered at Brown.

43.     On October 27, 2014, Dr. Miller informed Ms. Doe that the toxicology analysis of her samples by Lifespan indicated a positive result for GHB.

44.     Throughout the first week of November 2014, Brown DPS interviewed numerous members of Phi Psi and other witnesses about the events of October 17 and 18, 2014.  On November 4, 2014, Defendant Smith provided a witness statement to DPS admitting that he had served alcohol at the unregistered event on October 17 and 18, 2014, and that he had specially prepared a drink for a female guest.  He denied drugging the beverage.  On November 7, 2014, Defendant Smith admitted in another interview with DPS that he had served alcohol to Ms. Doe and Ms. Roe at the party, after being shown their photographs.

13

45.     On November 8, 2014, the University issued another Community Notification in which it stated that an investigation into the drugging allegations was ongoing.  The University stated further that one of the two students involved had tested positive for GHB and that it was determining whether violations of Rhode Island state criminal law and/or of the Student Code of Conduct had occurred.

46.     On November 10, 2014, Ms. Doe filed a Campus Incident Complaint alleging that Mr. Jones had sexual intercourse with her without her consent on October 18, 2014.

47.     On November 15, 2014, Brown University President Paxson sent an email to all parents of Brown students, providing information about the alleged drugging and subsequent sexual assault of a female student**.**

48.     A few days later, Ms. Roe visited Health Services to have hair samples harvested by Brown DPS officer Detective Peck for toxicology analysis of date rape drugs, including GHB. Sgt. Carvalho completed the testing request form for the sample, making at least two critical errors that contributed to invalid test results.  Thereafter, Brown University sent out the specimen to The Carlson Company, a laboratory in Colorado, which outsourced the analysis of the hair sample to ExperTox, a disreputable laboratory in Texas that has been embroiled in public controversy for its shoddy work.  The hair analysis ExperTox purports to perform is not generally accepted by forensic experts in the field.

49.     The University initiated three separate but overlapping disciplinary proceedings related to the events of October 17 and 18, 2014, which moved forward in November and December against Defendant Phi Psi, Mr. Jones, and Defendant Smith.

## The Phi Kappa Psi Investigation and Hearing

50.     On November 11, 2014, Associate Dean Castillo-Appollonio notified Ms. Doe that Phi Psi was being charged with four offenses of the Student Code of Conduct: (1) Offense IIa: Actions that result in or can be reasonably expected to result in physical harm to a person or persons; (2) Offense Va(i): Illegal possession or use of drugs; (3) Offense Vb(i): The illegal provision, sale, or possession with intent to sell/provide drugs; (4) Offense IX: Violation of operational rules governing various offices, departments and facilities of the University (e.g., Residential Life, Student Activities Office, Dining Services, Computing and Information Services, the Libraries, etc.).  A disciplinary hearing was set for November 20, 2014, and later rescheduled for December 3, 2014.

51.     Ms. Doe selected faculty member Dr. William Fairbrother to act as her hearing advisor for the Phi Psi hearing.  On November 24, 2014, Dr. Fairbrother contacted Assistant Dean Castillo-Appollonio to request that the University provide Ms. Doe all electronic communications on its servers sent to or from Phi Psi members that related to the unregistered party and/or related to date rape drugs.

52.     Later that day, Ms. Doe contacted University President Paxson to request support in her efforts to obtain academic accommodations from professors.  The accommodations were necessary because Ms. Doe's emotional distress and trauma related to the drugging and subsequent sexual assault, and stress from the demanding process of making, supporting, and pursuing charges against Defendant Phi Psi, Defendant Smith and Mr. Jones, was taking a toll on her academic performance.  President Paxson expressed concern to Ms. Doe about the hardships she had endured but declined to intervene with professors on her behalf.  Ms. Doe was ultimately left to act on her own behalf to make arrangements with professors to complete coursework and

maintain her Grade Point Average ("GPA") during the months following the drugging and sexual assault.

53.     On November 25, 2014, Dean Castillo-Appollonio informed Dr. Fairbrother that the University would not require Phi Psi to produce the electronic communications related to date rape drugs or the events detailed above.  She stated that if Brown DPS chose to pursue a criminal investigation into the incident, a warrant would be required to carry out a search of these communications.  Brown DPS never did so.

54.     On December 3, 2014, the Student Conduct Board held a disciplinary hearing for the four offenses charged to Phi Psi.  The fraternity members who testified, including its President, readily admitted that they hosted the unauthorized party despite their recognition that doing so increased the risk for those who attended the party.  They justified their willful violation of University policy by asserting that compliance would have required having to jump through too many hoops, and would have created additional expense for Phi Psi that it wished to avoid. Finally, they testified that no one at Brown University actually registers their parties.  Witnesses from Psi Phi also testified that there was discussion among the members about whether the unregistered party should be held at all given that Phi Psi had just come off a period of suspension, but that Defendant Smith strongly advocated for the fraternity to throw the unregistered party and purchased the alcohol that was served at the party.

55.     On December 10, 2014, the Student Conduct Board found Phi Psi "Responsible" for all four charged offenses.  The punishment imposed was withdrawal of recognition of the Phi Psi chapter at Brown University for four years.  Phi Psi appealed this determination.

### The Jones Investigation and Hearing

56.     On November 10, 2014, while the proceedings against Defendant Phi Psi were underway, Ms. Doe filed a Campus Incident Complaint alleging that Mr. Jones had sex with her when she was unable to consent due to her incapacitation from the drink provided by Defendant Smith.

57.     On November 21, 2014, Mr. Jones provided a witness statement responding to Ms. Doe's allegations in which he asserted that Ms. Doe had been lucid during their sexual encounter.  He falsely claimed that he paused before initiating each instance of sexual contact with Ms. Doe to explicitly request consent, including an explicit request for permission to remove her shirt, unzip her pants, and engage in sexual contact.  Mr. Jones's statement was patently not credible.  Mr. Jones further asserted that he noticed no signs of Ms. Doe's impairment until **after** he had sexual intercourse with her.

58.     On December 2, 2014, Associate Dean Castillo-Appollonio notified Ms. Doe that Mr. Jones had been charged with two offenses of the Student Code of Conduct: (1) Offense IIIa: Sexual Misconduct that involves non-consensual physical contact of a sexual nature; and (2) Offense IIIb: Sexual Misconduct that includes one or more of the following: penetration, violent physical force, or injury.

59.     The disciplinary hearing on the sexual assault was held on December 15, 2014.  It focused on whether Mr. Jones was able to detect signs of Ms. Doe's drugged incapacitation rather than whether Ms. Doe was able to give consent or whether the sex was unwelcome, which is the standard set out by the Department of Education Office for Civil Rights for determining whether sexual conduct constitutes unlawful sexual harassment.  Ms. Doe testified that she had

been rendered motionless and unable to speak as a result of being drugged at Psi Phi and was thus incapable of providing consent to sexual contact with Mr. Jones.

60.     On December 22, 2014, the Student Conduct Board found Mr. Jones "Not Responsible" for the two charges of sexual misconduct.  The Board stated that evidence was insufficient to show that Mr. Jones knew or should have known of Ms. Doe's impairment resulting from the drugged drink she ingested at the party earlier in the evening.  While the Board credited Ms. Doe's testimony that she was incapacitated throughout the sexual encounter, it found that the large gaps in her memory, due to her reaction to the beverage served by Defendant Smith, provided an inadequate basis to challenge Mr. Jones's version of events.  In effect, the Board's decision put the burden on Ms. Doe to have consumed just enough of the date rape drug to both have exhibited obvious symptoms of incapacitation and to remember having exhibited those symptoms; Ms. Doe's incapacitation was used against her.  In reaching this determination, the Board used an inappropriate consent standard that applies to the determination of rape in a criminal context, rather than the far lower unwelcomeness standard established for sexual harassment by the United States Supreme Court in *Meritor Savings Bank v. Vinson* (court rejected consent as the appropriate standard of proof for civil sexual harassment claims), and currently applicable to Title IX compliance under the policy of the Department of Education Office for Civil Rights.

## The Smith Investigation and Scheduled Hearing

61.     On December 4, 2014, Associate Dean Castillo-Appollonio notified Ms. Doe that the Office of Student Life was investigating Defendant Smith for serving Ms. Roe, and thus Ms. Doe, a beverage containing GHB at the unregistered Phi Psi event.

62.     On December 9, 2014, Defendant Smith submitted an additional witness statement to the Student Conduct Board.  Contradicting his earlier statements in which he admitted having served Ms. Doe and Ms. Roe an alcoholic beverage, Defendant Smith now denied recalling specifically whether he served either or both of them.  He accused the women of colluding to create a "false memory" that he served them a beverage, and challenged their certainty about not drinking any additional alcohol after receiving the beverage at the Phi Psi event.

63.     On December 10, 2014, Associate Dean Castillo-Appollonio notified Ms. Doe that Defendant Smith had been charged with three offenses of the Student Code of Conduct: (1) Offense IIa: Actions that result in or can be reasonably expected to result in physical harm to a person or persons; (2) Offense Va(i): Illegal possession of drugs; and (3) Offense Vb(1): The illegal provision, sale, or possession with intent to sell/provide drugs.  A disciplinary hearing for Smith was scheduled for December 19, 2014.

64.     Mr. Smith retained legal counsel for the upcoming disciplinary hearing.  His counsel retained a medical expert, Dr. David Greenblatt of Tufts University, to analyze the toxicology evidence related to the charges.  On December 12, 2014, Lifespan transmitted the laboratory report concerning Ms. Doe's positive GHB test to Dr. Greenblatt.

65.     Also on December 12, 2014, Ms. Doe emailed Sgt. Carvalho, requesting that he correct or clarify inaccuracies and misleading errors that he made in his initial account of the interview with her and Ms. Roe.  Ms. Doe was concerned that Sgt. Carvalho's errors, if uncorrected, would create an impression that the women themselves had provided information inconsistent with later statements.  Sgt. Carvalho refused to make any corrections to his report or

draft an addendum explaining his errors and reassured Ms. Doe, falsely, that her first-hand account would be more probative for the disciplinary hearing than his reports.

66.     On the morning of December 15, 2014, four days before his disciplinary hearing was scheduled to occur, University administrators informed Ms. Doe that Defendant Smith's counsel filed for an injunction in federal district court to postpone the hearing.  They further advised her that the injunction was immediately granted but refused to provide her with a copy of the court's Order.

67.     At the close of the fall semester, the stress of the preceding months had taken a significant toll on Ms. Doe.  She lost out on activities that would have greatly enriched her education when the trauma of her experiences and the demands of the hearing process required that she quit an internship, withdraw from a credited research project and the opportunity to earn honors in Biochemistry, and delay enrollment in a challenging Inorganic Chemistry course that is required for many medical school applications.  In addition, Ms. Doe was unable to participate in the very activities and social experiences that led her to choose Brown University for her undergraduate education.  Due to the stress and anxiety of events related to the Phi Psi party, Ms. Doe was forced to withdraw from her responsibilities as President of the Social Action House. She also withdrew from the meal plan to avoid interactions with fraternity members in the cafeteria.  Ms. Doe became increasingly isolated over time as she struggled to recover from her assaults.  She soon stopped attending classes, and essentially educated herself over the next year and a half while remaining shuttered in her dorm room.

### Challenges to the Toxicology Analyses Provided by the University

68.     On January 7, 2015, Associate Dean Castillo-Appollonio contacted Ms. Roe to notify her that the toxicology results for her hair sample were inconclusive because the entire

strand length of her hair had been tested rather than a segment corresponding to the date of the alleged incident.

69.     Also on January 7, 2015, Phi Psi appealed the disciplinary ruling made in December of 2014, arguing that the hearing had been procedurally unfair, and that the inconclusive results for GHB in Ms. Roe's hair sample established that the drink provided by Defendant Smith did not contain the substance.

70.     On January 12, 2015, the Director of Health Services, Dr. Unab Khan, contacted The Carlson Company to clarify whether the results of Ms. Roe's toxicology test were inconclusive or negative.  Dr. Ernest Lykissa, the discredited toxicologist affiliated with ExperTox, informed Dr. Khan that the results were conclusively negative for GHB.

71.     Later that day, Associate Dean Castillo-Appollonio notified Ms. Doe, Ms. Roe, and Defendants Phi Psi and Smith that the University initially believed the toxicology results were inconclusive as to the presence of GHB, but recent conversations with Dr. Lykissa confirmed that the results were in fact negative.

72.     On January 13, 2015, University Provost Joseph Meisel issued a decision denying Phi Psi's appeal and request for remand.  He determined that witness testimony and Ms. Doe's positive test for GHB established that she and Ms. Roe had both ingested GHB after drinking the beverage provided by Defendant Smith, regardless of the results of Ms. Roe's toxicology testing. He also noted that Phi Psi had numerous Student Code violations in recent years, including a suspension of social activities that had expired only weeks before the unregistered event in October 2014, which supported a significant punishment to deter further misconduct.

73.     On January 15, 2015, Dr. Greenblatt issued his report to Defendant Smith's counsel concerning the toxicology testing of Ms. Doe's urine sample by Defendant Lifespan,

concluding that the lab report was "invalid and uninterpretable." He based this conclusion on the lack of information provided about calibration standards and storage conditions that can impact concentrations of GHB in urine, and the laboratory's error in basing its positive result on the inaccurate premise that a normal GHB level is "undetectable."

74.     On January 16, 2015, University President Paxson notified Phi Psi that there would be a limited review of the findings and sanctions from the fall 2014 hearing. Again noting Phi Psi's recent history of infractions of the Student Code, President Paxson maintained the sanctions while the limited review proceeded.

75.     On January 19, 2015, the University issued a Community Notification that provided updated information about its investigations into fraternity misconduct, including the proceedings against Phi Psi. The Notification explained that a challenge to the validity of the positive GHB test had been raised, and that the charges against the fraternity would be subject to limited review as a result. The University again acknowledged Phi Psi's "history of disciplinary infractions involving unauthorized events and alcohol violations."

76.     With each official notification and University action taken against Phi Psi, Ms. Doe experienced backlash and hostility from a segment of the student population which faulted her for initiating a disciplinary action against Phi Psi. This backlash further contributed to the sexually hostile and retaliatory environment to which Ms. Doe was being subjected. Defendant Brown University took none of the actions available to it to control, contain, or ameliorate this retaliation.

77.     On January 20, 2015, Ms. Doe contacted Provost Meisel to appeal the Student Conduct Board decision finding Mr. Jones "Not Responsible" for the sexual misconduct offenses. Ms. Doe asserted that the Board erred by applying a reasonable doubt standard to the

evidence, rather than the proper preponderance of the evidence standard.  Ms. Doe also asserted

that the Board's reasoning that her incomplete memories could not adequately refute Mr. Jones's

account of the encounter effectively immunizes assailants who commit assault on incapacitated

victims.

78.     On January 23, 2015, Vice President for Campus Life and Student Services

Margaret Klawunn notified Ms. Doe that the University would be refunding her tuition on a

prorated basis for October 17 – December 20, 2014, in the amount of $13,900.

79.      On January 29, 2015, Defendant Smith's counsel sent a letter to the University

demanding that it terminate the proceedings against him due to the developments related to the

toxicology testing for Ms. Doe and Ms. Roe.

80.     On February 4, 2015, Ms. Doe again requested a copy of the injunction she was

told had been granted to Defendant Smith in December 2014 to postpone his Student Conduct

Board Hearing.  Associate Dean Castillo-Appollonio refused her request.

81.     On February 5, 2015, the University received a report from its own expert

concerning the toxicology analyses it had ordered for urine and blood samples from Ms. Doe and

hair samples from Ms. Roe.  The report, prepared by Dr. Guy Vallaro, Director of the Division of

Scientific Services, Connecticut Department of Emergency Services and Public Protection,

concluded that the toxicology analysis performed by Brown's agents -- Lifespan as to Ms. Doe's

urine sample and ExperTox as to Ms. Roe's hair sample -- were improperly performed and

therefore inconclusive.

82.     On or around February 5, 2015, Ms. Doe's father contacted Dr. William Bastan,

director of Rhode Island Hospital Lifespan Laboratories, to discuss the toxicology analysis

completed on his daughter's sample.  Dr. Bastan was vague about the circumstances of the

testing.  When Ms.  Doe's father requested that Lifespan return what was left of the sample so that he could arrange for testing at a qualified forensic laboratory, Dr. Bastan stated that Ms. Doe's urine specimen had been discarded some weeks prior.

83.     On February 12, 2015, Vice President Klawunn sent a letter to Ms. Doe, Ms. Roe, Defendant Smith, and Ross Hegtvedt, then President of Defendant Phi Psi, detailing the University's assessment of the forensic evidence gathered, analyzed, challenged, and evaluated as of that date.  She stated that as a result of the controversy surrounding the analysis of Ms. Doe's sample, Lifespan would no longer offer the particular GHB test in question, due to concerns about its methodology.

84.     Following the letter and document circulation by Vice President Klawunn, Defendant Smith submitted a letter to the school arguing that he had been subjected to an unjust process, and that the University should have dropped all proceedings against him once it was in receipt of Dr. Vallaro's report.

85.     On February 16, 2015, Defendant Phi Psi wrote to Provost Meisel raising similar arguments that their punishment was based on evidence now discredited by Dr. Vallaro's report.

86.     On February 20, 2015, Provost Meisel issued his review of the Phi Psi appeal.  He reiterated his belief that Ms. Doe and Ms. Roe were given some substance that significantly incapacitated them, notwithstanding the negative test results for GHB for both women.  He nonetheless found that the change in the evidence supported modification of the fraternity's penalty and reduced the punishment from four years to two and a half years without official recognition.

87.     Also on February 20, 2015, Provost Meisel issued his review of Ms. Doe's appeal of the Jones hearing decision.  Stating again that evidence suggested that Ms. Doe and Ms. Roe

had been given an incapacitating substance other than alcohol at the Phi Psi party on October 17, 2014, Provost Meisel nevertheless found that the evidence presented at the hearing did not sufficiently establish that Mr. Jones knew or should have know the extent of her subsequent impairment.  He therefore upheld the "Not Responsible" determination.

88.    On February 21, 2015, Associate Dean Castillo-Appollonio informed Ms. Doe and Ms. Roe that the University was dropping the disciplinary proceeding against Defendant Smith despite repeated prior assurances that the University would proceed against him regardless of the toxicology reports, based on the strength of witness statements and Defendant Smith's own admissions that he facilitated the unregistered party at which underage students were served 95% proof grain alcohol.   She stated that "new information" established that the University did not have sufficient evidence to move forward.  This conclusion was not surprising given the extraordinary actions taken earlier by University officials to protect Defendant Smith, the son of a University Trustee, by, *inter alia*, rejecting the receipt of documentary evidence that Defendant Smith was conducting a false identification business from his University housing for the purpose of facilitating underage drinking, and was using his University mailbox for that purpose, in violation of both federal and state law.  Rather than receiving this evidence and investigating it, Brown officials declined to take any action about illegal activity taking place on campus and instead actively pressured the witness not to submit the evidence by informing him that he would have to proceed personally against Defendant Smith in the disciplinary process and would likely have to drop classes to do so.

89.    Emboldened by the fraternity's reduced punishment and the dismissal of the University's charges against Defendant Smith, Defendant Phi Psi distributed leaflets campus-wide over the last week of February 2015.  The leaflets, which were posted on every campus

building and on dorm room windows and were "table slipped" on every table in the cafeteria,

provided a link to a statement by Phi Psi, in which the fraternity protested the University's

treatment and punishment, and disclosed confidential information about the allegations of Ms.

Doe and Ms. Roe.  The letter referenced the negative test results for the two accusers but did not

mention that there was substantial testimony by multiple witnesses, including a Phi Psi member

who had warned Defendant Smith that Ms. Roe was heading home in a terrible state, that the

women were incapacitated.  Phi Psi gave the false impression that the drug testing was

conclusive that there had been no impairing substance served to Ms. Doe and Ms. Roe, thereby

portraying itself as the victim of vindictive and baseless charges.

90.     After Ms. Doe became aware that these leaflets had been distributed around the

entire campus, she experienced tremendous anxiety and fear.  By emails dated February 26 and

27, 2015, Ms. Doe and Ms. Roe informed both Vice President Klawunn and Associate Dean

Castillo-Appollonio that Defendant Phi Psi had distributed leaflets around campus about them

and that the fraternity's campaign created a hostile environment for them and made them feel

unsafe at the University.  They expressly identified the fraternity's actions as retaliation in

violation of their rights under Title IX.  Vice President Klawunn responded that the University

was removing the leaflets where they had been placed without authorization and had told

Defendant Phi Psi that the University did not approve of its actions.  Upon information and

belief, the University failed to take further action against Defendants Phi Psi or Smith as a result

of their retaliatory actions against Ms. Doe.

91.     On February 27, 2015, Ms. Doe requested that she be provided with any public

records of the report made by Brown DPS to the Providence Police Department related to the

events of October 17 and 18, 2014.  Sgt. Carvalho informed her that the report he made to the

University was forwarded to the Providence Police Department as a notification, and that the Providence Police Department did not subsequently make a report of its own.

92.     Also on February 27, 2015, Ms. Doe wrote a letter to Associate Dean Castillo-Appollonio appealing the decision to drop the disciplinary proceedings against Defendant Smith, which would have afforded her the opportunity to present evidence of her allegations.  She stated that University officials had told both her and Ms. Roe on multiple occasions that the hearing would proceed regardless of the toxicology results based on the strength of witness statements, including that of Ms. Roe's roommate, an EMT, who testified that her condition upon returning from the Phi Psi party was inconsistent with symptoms of alcohol impairment.  In addition, the University had previously rendered findings after the Phi Psi hearing that Ms. Doe and Ms. Roe were given an incapacitating substance at the fraternity party, a finding that was affirmed by Provost Meisel in his decisions for the fraternity appeal and Ms. Doe's appeal of the Jones hearing.

93.     Forensic toxicologists, including those with the Federal Bureau of Investigation, readily acknowledge that conclusive evidence of drugging is rarely obtained in cases of drug facilitated sexual assault and basing a decision not to proceed with remedial action or disciplinary action on the lack of such evidence is a deviation from the standard of care.

94.     On March 1, 2015, the University issued another Community Notification in which it admitted that the laboratories it had hired to conduct drug testing in the case had failed to produce reliable, scientifically accepted results.  The University stated that it would no longer use these laboratories, and that it had learned from its investigation into this matter.

95.     As with prior University-wide notifications regarding Ms. Doe's allegations and Phi Psi's culpability, the topic of Ms. Doe's drugging and subsequent sexual assault became a

common topic of conversation campus-wide.  A large segment of the student population

criticized Ms. Doe and Ms. Roe for allegedly making false charges against Defendants Phi Psi

and Smith, and the University for taking action against the fraternity.  These students disputed

and/or minimized the trauma that Ms. Doe had experienced, leading to her increased depression,

anxiety, and isolation on campus.

96.     Other students who knew Ms. Doe and Ms. Roe personally or who themselves

had experienced sexual abuse at Brown objected to the University's treatment of Ms. Doe.  In

early March, around 30 students engaged in a silent protest during a University event by

attending with dollar bills taped across their mouths, marked with a red "IX."  As reported by

*Bloomberg Business News* in its March 12, 2015, article, "Students Say Brown Decision on Sex

Assault Case Was Motivated by Money," the dollar bills symbolized the students' belief that

Defendant Smith's father's position as a Brown trustee influenced the University's decision to

drop the proceedings against him.  On March 15, 2015, a group of more than 400 students

marched silently through the Brown campus to again protest the University's handling of Ms.

Doe and Ms. Roe's complaint against Defendant Smith and Mr. Jones.  In a highly visible

manner, Phi Psi members congregated together during the march, raising the fraternity's flag at

Sears House. They conducted themselves as a fraternity, in an aggressive act of defiance against

the sanctions the University had previously imposed against the organization, which barred them

from engaging in such activities.  Defendant Brown took no action to punish this retaliatory

conduct or enforce its sanctions against the fraternity or Defendant Smith.

97.     On March 16, 2015, *Inside Higher Education* published an article, "Brown U.

Sexual Assault Investigation Draws Criticism from Accused and Accusers," that provided an

account of the controversy related to the events of October 17 and 18, 2014.  Defendant Smith

was quoted anonymously, as the student who had been accused of drugging the two women.  He stated that his father, a trustee of the University, had been "furious" when his hearing was initially scheduled without adequate time for him to prepare but stated that he "wasn't sure" whether his father had been in touch with the University at that point in time.  The article noted that during the march the previous day, students again taped dollar bills to their mouths marked with a red "IX" to protest the University's apparent special treatment of a trustee's son.

98.     By letter dated March 18, 2015, Associate Dean Castillo-Appollonio informed Ms. Doe about the reasons the University had dropped disciplinary proceedings against Defendant Smith.  While reiterating its position that charges could not proceed because the toxicology results had been inconclusive, the University failed to accept any responsibility for its actions in retaining laboratories that even the most perfunctory vetting would have demonstrated were unable to perform the industry-standard date rape drug toxicology analysis or to otherwise meet the requisite requirements of forensic evidence handling.  Associate Dean Castillo-Appollonio's letter caused Ms. Doe to experience further feelings of defeat and this in turn interfered with her ability to participate in and enjoy the full benefit of the educational services and opportunities afforded by Brown University.

99.     On April 19, 2015, Ms. Doe observed members of Defendant Phi Psi congregating at Sears House, in violation of the sanctions imposed by the University that prohibited all fraternity events and gatherings.  Ms. Doe informed Associate Dean Castillo-Appollonio of the gathering and further noted that it made her feel unsafe on campus.  Associate Dean Castillo-Appollonio informed Ms. Doe that the University would investigate, but failed to inform her about whether the University had taken any disciplinary action against the fraternity.

100.    Upon information and belief, Defendant Phi Psi continued to hold unauthorized meetings, including unauthorized "rush" events at which it has recruited new members, during Ms. Doe's final year at Brown.  These activities continued despite the suspension of two years imposed by the University.  The University failed to take effective corrective measures, or take any further disciplinary action against Defendant Phi Psi.

101.    The University's mishandling of the serious allegations raised by Ms. Doe and Ms. Roe evinced a deliberate indifference to Ms. Doe's rights under Title IX.  As a result of the University's failure to undertake proper analysis within the time required for accurate forensic results, and the destruction of Ms. Doe's samples by the laboratory retained by the University, Ms. Doe and Ms. Roe may never know what substance Defendant Smith gave them to drink.

102.    By abandoning its fact-finding proceedings against Defendant Smith and reducing the punishment against Defendant Phi Psi after the physical evidence was challenged, the University created a misimpression that Ms. Doe's and Ms. Roe's reports amounted to false allegations when in fact substantial evidence supported their claim.  For the remainder of her time at Brown, Ms. Doe faced hostility and resentment campus-wide from Phi Psi members, including Defendant Smith, and their supporters, who blamed her for the sanctions imposed by the University.  The University's failure to provide a thorough disciplinary process for these claims to be investigated and adjudicated, and its failure to acknowledge its own egregious mistakes in its handling and analysis physical evidence, left Ms. Doe the target for anger from an entire organization of men, and their supporters, with whom she shared a campus.

103.    Despite the imposition of a No Contact order in April 2015, Defendant Smith began staying overnight in Ms. Doe's dormitory, heightening her fear that she would have contact with him in the unisex bathrooms or elsewhere in her living unit.  This increased her fear

and further contributed to the sexually hostile environment she experienced on campus since reporting her concerns about being drugged and subjected to sexual assault on October 18, 2014.

**Damages Suffered by Plaintiff Doe Because of Defendants' Unlawful Conduct**

104.    Since the events of October 17 and 18, 2014, Ms. Doe has experienced severe emotional harm.  She continues to endure the psychological effects of having been drugged by one student, and opportunistically sexually assaulted by a second student as a direct result of her incapacitation.  As with many survivors of drug facilitated sexual assault, Ms. Doe's trauma has been amplified by the fact that she was cognitively impaired during the experience.

105.    The conduct of Defendants subsequent to the drugging and sexual assault resulted in the derailment of Ms. Doe's studies, withdrawal from extracurricular activities and enrichment programs, the loss of enjoyment of everyday campus activities, and disruptions to relationships with members of the University community.  Ms. Doe lost invaluable educational opportunities related to her studies.

106.    In retaliation for Ms. Doe's assertion of her Title IX rights and her objections to the University's violation of those rights, Brown University denied Ms. Doe an interview for admission to medical school despite the fact that her grades and MCAT scores were exemplary, and she was one of the very top, if not the top, pre-med students at Brown in her graduating class.  Ms. Doe was accepted to the most highly ranked medical schools in the United States but was denied an interview by Brown even though its medical school is ranked far below 17 other schools, including Harvard University and Stanford University, which offered Ms. Doe admission.

107.    After Ms. Doe asserted her claims against Defendants, Defendant Smith, through counsel, threatened to sue Ms. Doe for defamation, causing her further anxiety and fear.

## CAUSES OF ACTION

## COUNT ONE

**Discrimination in Violation of the Educational Amendments of 1972 (Title IX), 20 U.S.C. § 1681 *et seq.* against Brown University**

108.     Plaintiff incorporates all preceding paragraphs into this Count by reference as though fully stated herein.

109.     Under Title IX, 20 U.S.C. § 1681, it is unlawful for an educational institution receiving federal funds to discriminate on the basis of sex.  A recipient has engaged in discrimination when it manifests deliberate indifference to discriminatory conduct directed at a student, of which it has actual knowledge.  Sexual harassment of a student by another student, including sexual assault and sex-based violence, triggers a funding recipient's duties under Title IX to respond with appropriate corrective measures, and an inadequate response by a funding recipient to a complaint violates its responsibilities under Title IX.

110.     Defendant Brown University acted with deliberate indifference to the rights of the Plaintiff through its clearly unreasonable response to the reports she made related to her drugging and sexual assault, and its actions and inactions related to the circumstances under which both occurred, thus materially impairing Plaintiff's ability to pursue her education at Brown University in violation of Title IX.

111.     Defendant Brown University's mishandling of suspected drug-facilitated sexual assault was deliberately indifferent to the rights of students to be free from sex-based violence because the University engaged in various practices that effectively prevented the Plaintiff and other victims from receiving proper medical care or access to potential evidence.  At all times relevant to this complaint, the University provided health care facilities to students on campus,

and represented that Health Services was the proper facility for students to go for examination and treatment in cases of suspected drugging and sexual assault.

112.    The testing that Brown provided to the Plaintiff did not comply with professional standards for forensic toxicology in a number of ways that impacted her medical care and her ability to pursue disciplinary, civil, or criminal action against her assailants.

113.    Following the inadequate testing request for Plaintiff's specimens, the University failed to provide adequate forensic services appropriate for evidentiary use.  Rather than hiring a competent forensic laboratory to store and analyze specimens provided by potential victims, including the Plaintiff, the University instead used Lifespan, a medical laboratory that was incapable of providing forensic analysis of any kind.  Upon information and belief, Lifespan had previously informed Brown that it could not provide forensic analysis.

114.    Lifespan did not engage in proper chain of custody practices, did not test for a comprehensive panel of date rape drugs that included blood alcohol levels, did not provide certification of calibration, quality control, or storage practices, and did not preserve and retain the specimens provided by the University's Health Services, resulting in the destruction of evidence.

115.    The University told potential victims, including Ms. Doe, that it was providing access to appropriate forensic toxicology services when in fact it was not.  As a result, potential victims, including the Plaintiff, were denied their right to have evidence of their drugging properly preserved, stored, and analyzed in a manner that was useful for medical treatment or evidentiary use.  By undertaking a routine practice with respect to allegations of the drugging of female students that resulted in the production of unreliable, inconclusive toxicology results, and

the improper destruction of evidence precluding any later opportunity to obtain accurate results, the University acted with deliberate indifference to Ms. Doe's rights under Title IX.

116.    The University also demonstrated deliberate indifference to sex discrimination in violation of Title IX when it failed to undertake a meaningful investigation or impose disciplinary measures against Defendant Smith in response to the Plaintiff's report that he served her and Ms. Roe an incapacitating beverage, despite substantial evidence that included the testimony of the women, witness testimony, video evidence of their physical symptoms after ingesting the drink, and Defendant Smith's admissions that he had served them an alcoholic beverage that he mixed.  University Provost Meisel determined that Ms. Doe and Ms. Roe had been given an incapacitating beverage, whether alcohol alone or alcohol adulterated with an additional substance, in his decisions for the appeals of both the Phi Psi and Jones hearings. Notwithstanding the significant circumstantial evidence of Defendant Smith's sex-based targeting of a student for incapacitation, the University claimed that inconclusive toxicology results—the poor quality of which was largely due to its own deliberate indifference, and which are widely held by experts not to provide dispositive evidence in most cases—supported dropping the investigation into the Plaintiff's complaint.  This decision was clearly unreasonable in light of the circumstances.

117.    By failing to provide Ms. Doe and Ms. Roe any disciplinary forum in which to raise their complaint that Defendant Smith provided them with a dangerous substance that led to physical and emotional harm and to obtain the fact finding determinations that such a forum provides, the University acted with deliberate indifference to his discriminatory conduct, of which it had actual notice, and Ms. Doe's rights.

118.     Brown University has been on notice about student-on-student sexual harassment and sexual assault that creates a sexually hostile environment, but has failed to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects.  The University had actual notice of endemic sexual assaults occurring on campus through complaints filed by students under the Student Code of Conduct and Title IX.  In addition, the University had actual notice through its employees at DPS and Health Services, in the years prior to Ms. Doe's and Ms. Roe's allegations, that other female students reported being drugged at campus events.

119.     Defendant Brown University was on notice about the incidence of sexual assault on its campus, and the role that fraternities and alcohol and/or drug consumption has played in facilitating these assaults.  Despite this knowledge, the University allowed Phi Psi, and other fraternities, to operate "self-governing" housing on campus and to host unregistered parties, in violation of University rules.  The housing operated by Phi Psi at Sears House included a basement area with a bar that was used to host unregistered parties at which alcohol was served to underage students.   The University failed to take reasonable measures to prevent alcohol from being served to underage students at this location.  The University failed to provide notice to female students that fraternity housing where alcohol is present combines two known risk factors for dramatically increased likelihood of sexual assault.

120.     Instead, the University has endorsed Greek Program Housing, communicating to the student body that this housing offers the same level of safety and no greater risk of injury as other housing available on campus.  The University did not acknowledge or inform students of the heightened risks specific to fraternities and to locations where alcohol is served without supervision.  Female students were thereby without notice from the school that locations such as

Sears House presented a significant risk of injury, including incapacitation due to alcohol or drugs, and sexual assault.

121.    As a direct and proximate result of the University's practices detailed above that were sufficiently severe to interfere with Ms. Doe's ability to participate in and enjoy the benefits of the educational services offered by Brown University, and as a direct and proximate result of the University's deliberate indifference to the Plaintiff's right to be free from sexual violence, including sex-based drugging and subsequent heightened vulnerability to unwelcome sexual contact, Plaintiff was denied access to a safe and secure educational environment in violation of Title IX, and was otherwise injured.

## COUNT TWO

**Retaliation in Violation of the Educational Amendments of 1972 (Title IX), 20 U.S.C. § 1681 *et seq.* against Brown University**

122.    Plaintiff incorporates all preceding paragraphs into this Count by reference as though fully stated herein.

123.    Title IX, 20 U.S.C. § 1681 prohibits retaliation by a funding recipient against any individual who engages in activity protected by Title IX, making it unlawful for an educational institution receiving federal funds that knows of protected activity to engage in action that is materially adverse to the individual engaging in the protected activity. Title IX places funding recipients on notice that they may be liable for their failure to respond to the discriminatory acts of certain non-agents.

124.    Ms. Doe engaged in activity protected by Title IX when she reported Defendant Phi Psi and Defendant Smith's acts of sexual harassment and when she reported sexual assault, putting Defendant Brown University on notice of its responsibility to treat the Plaintiff in accord with its obligations under Title IX, including but not limited to its obligation not to engage in

retaliation or condone retaliatory acts against the Plaintiff by non-agents over which it had a right and duty to control.

125.    Brown University had an obligation under Title IX to exercise control over Defendant Phi Psi and to take appropriate disciplinary action against Defendant Phi Psi and Defendant Smith for their infractions of the Student Code of Conduct.

126.    Following decisions by Defendant Brown University to suspend disciplinary proceedings against Defendant Smith and reduce the punishment of Defendant Phi Psi, Plaintiff was subject to repeated acts of retaliation by Defendant Phi Psi and its supporters.

127.    Defendant Brown University was placed on notice by Plaintiff and others that they were being subjected to retaliation, including retaliatory harassment.  Defendant Brown University failed to take any action against Defendant Phi Psi when it repeatedly and with obvious malice engaged in harassment of the Plaintiff, in retaliation for her protected activity under Title IX.

128.    By choosing to permit Defendant Phi Psi's initial acts of retaliation to go unpunished and, thereafter, choosing to allow its escalated attacks to proceed without consequence, Defendant Brown University became liable for the acts of retaliation against the Plaintiff and responsible for the clear and direct violation of the Plaintiff's rights under and pursuant to Title IX.

129.    As a direct and proximate result of the University's actions and decisions detailed above that were sufficiently severe to interfere with the Plaintiff's ability to participate in and enjoy the benefits of the educational services offered by Brown University, Plaintiff was denied access to a safe and secure educational environment in violation of Title IX and was otherwise injured.

## COUNT THREE

### Negligence against Brown University

130.    Plaintiff incorporates all preceding paragraphs into this Count by reference as though fully stated herein.

131.    Defendant Brown University was negligent in its collection and handling of the physical evidence related to Ms. Doe's and Ms. Roe's allegation of drugging by Defendant Smith.

132.    By providing health care facilities to students on campus, and representing Health Services as the proper facility to present oneself for examination in cases of suspected drugging and sexual assault, the University owed students a duty of care in the provision of services at the facility.

133.    Brown breached this duty by failing to adequately collect and maintain physical evidence, failing to order the correct forensic examination of specimens taken, and by engaging Lifespan, a medical lab, to perform what was purported to be forensic testing.  As a result of this breach of duty, the testing undertaken by Defendant Brown resulted in unreliable, inconclusive results that did not, and could not, meet minimal standards of evidence for disciplinary, civil, or criminal action.

134.    As a direct result of this breach of the duty of care, Ms. Doe was denied the opportunity to have accurate forensic testing of the specimens she provided on October 18, 2014. Many date rape drugs, including GHB and alcohol, are detectable in urine within a limited window of time following ingestion.  To the extent that analysis is possible outside of this window, specimens must be stored in certain conditions to preserve accurate levels reflecting the toxicology of a particular moment in time.  Because the University used a medical laboratory

that did not document its storage of the sample, did not provide analysis using reliable forensic methodology, and did not preserve the sample after completing its analysis, Ms. Doe's specimen could not be used as evidence in proceedings against her assailant or Defendant Smith.

135.    As a result of these failures, Ms. Doe suffered significant emotional harm and was otherwise injured.  She was denied crucial information about the potential physical harms and risks associated with whatever substance she was given by Defendant Smith.  In addition, because of the negligence of Brown University, she was denied the opportunity to obtain reliable physical evidence that would have formed the basis for disciplinary, criminal, or civil action against Defendant Smith and was deprived of the full benefits of her education for which she paid.

136.    Defendant Brown University was also negligent in its oversight of Defendant Phi Psi with regards to the fraternity's practice of providing alcohol to underage students and creating conditions in which intoxication, drugging, and sexual assault were likely to occur.

137.    Defendant Brown University had a duty to supervise student groups under its control on campus in a manner that protected other students from known risks created by those groups.   The University had the authority to regulate the activities of Defendant Phi Psi, including the fraternity's management of housing at Sears House that included a bar area.

138.     The University had knowledge that Defendant Phi Psi's management of Sears House involved routine violations of university rules and criminal laws regarding alcohol and drugs, and yet failed to take appropriate action to prevent this conduct or warn students of the risks that it created.

139.    The activities at Sears House were well-known to the University, as they were conducted in plain view on campus, and involved alcohol and the attendant risks associated with

unregistered parties.  The University failed to address the conduct and risks despite repeated

infractions by Defendant Phi Psi.  Defendant Brown University was negligent in failing to take

prompt and effective action to prevent Defendant Phi Psi from continuing to engage in

unregistered parties, and the provision of alcohol to underage persons, which created a risk of

drugging and sexual assault, despite repeated violations of applicable laws, regulations, and

codes.  The University also failed to warn students, including the Plaintiff, of the risks presented

by the activities at Phi Psi, which included risks of alcohol intoxication and drug facilitated

sexual assault.

140.    As a result of its negligent oversight of Defendant Phi Psi, Ms. Doe was exposed

to the risk of injury and was in fact injured by the conduct of fraternity members, including

Defendant Smith.

## COUNT FOUR

### Premises Liability against Defendant Brown University and Phi Kappa Psi – Rhode Island Alpha Chapter

141.    Plaintiff incorporates all preceding paragraphs into this Count by reference as

though fully stated herein.

142.    Defendant Brown University was at all times the owner and landlord for Sears

House.

143.    Defendant Phi Kappa Psi Rhode Island Alpha Chapter members occupied and

resided in Sears House at all times relevant to this Complaint.

144.    Defendants Brown University and Phi Psi knew that Sears House was dangerous

to guests due to misuse of alcohol on the premises.  Known risks associated with alcohol,

especially when ingested by very young adults in large amounts without supervision, include

physical harm, adulteration of beverages with date rape drugs, and sexual assault.

40

145.    The Plaintiff was a social invitee to the premises of Sears House on October 17-18, 2014.

146.    As the owner of Sears House, Defendant Brown University owed a duty to persons reasonably expected to be on the premises to exercise reasonable care for their safety, including an obligation to protect against the risks of a dangerous condition on the premises of which the University knew or should have known.

147.    As resident and occupant of Sears House, with a measure of control over the property and activities therein, Defendant Phi Psi owed a duty to persons reasonably expected to be on the premises to exercise reasonable care for their safety, including an obligation to adhere to the University's policy for party registration, an obligation to adhere to state law by not serving underage students alcohol, and to otherwise protect against the risks of a dangerous condition on the premises of which the fraternity knew or should have known.

148.    Defendants Brown University and Phi Psi knew or had reason to know that it was foreseeable that female guests visiting Sears House could be harmed by the known dangers of the premises.

149.    Defendants Brown University and Phi Psi knew that the fraternity had committed repeated violations of the criminal laws of Rhode Island and the Student Code of Conduct for Brown University when it provided alcohol to underage members and students at fraternity events at Sears House.

150.    Defendant Phi Psi's negligent conduct included:

   a.    permitting its members to hold regular, unregistered parties on the premises that involved provision of alcohol to underage persons and inebriated persons, which

created an environment that made drugging and sexual assault likely and violated applicable laws, regulations, and codes;

b.  refusing to require its members to comply with applicable laws, regulations, and codes prohibiting the provision of alcohol to underage persons and prohibiting the drugging of women;

c.  hosting social events and refusing to take reasonable steps to enforce applicable laws, regulations, and codes prohibiting the provision of alcohol to underage persons and the drugging of women;

d.  refusing to eject, evict, or otherwise take measures to stop its members from making use of the property in a manner that posed a foreseeable risk of harm from the activities occurring on the premises;

e.  failing to protect guests from the risks of alcohol and/or drugging by providing inadequate supervision of "bartenders" during the party; and

f.  failing to provide a means for guests who become impaired at Phi Psi parties to receive safe passage to their housing units and/or medical attention as warranted.

151.    The activities at Sears House were well-known to the University, as they were conducted in plain view on campus, and involved alcohol and the attendant risks associated with unregistered parties.  The University failed to address the conduct and risks despite repeated infractions by Defendant Phi Psi.  Defendant Brown University was negligent in failing to take prompt and effective action to prevent Defendant Phi Psi from continuing to engage in unregistered parties, and the provision of alcohol to underage persons, which created a risk of drugging and sexual assault, despite repeated violations of applicable laws, regulations, and

codes.  The University also failed to warn students, including the Plaintiff, of the risks presented

by the activities at Phi Psi, which included risks of alcohol or drug facilitated sexual assault.

152.    As a direct and proximate consequence of Defendants' negligence, the Plaintiff

experienced the physical harms of being drugged at Sears House, the additional injury of sexual

assault that was facilitated by the hazardous conditions that were permitted to exist by the

University and Phi Psi, the continuing emotional harm of the trauma she experienced, and was

otherwise injured.

## COUNT FIVE

### Negligence against Fraternity Defendants

153.    Plaintiff incorporates all preceding paragraphs into this Count by reference as

though fully stated herein.

154.    Defendant Phi Kappa Psi, Inc. provides for the existence and recognition of

Defendant Phi Psi as a local chapter of its organization.  These Fraternity Defendants owed a

duty to Ms. Doe and other students on campus to manage and oversee Phi Psi operations and

activities of the members in a reasonably prudent manner.  Alternatively, these Defendants

assumed such a duty.

155.    The Fraternity Defendants hosted the party at which a member provided a drink

that caused severe impairment of Ms. Doe's physical and cognitive faculties, which in turn

facilitated her sexual assault by another guest present at the party.

156.    The Fraternity Defendants, including by and through their agents, breached their

duties to Ms. Doe and were negligent by, *inter alia*, empowering and relying upon underage

members to manage the premises of Sears House, including a basement area that included a bar,

without adequate training and supervision related to the provision of alcohol; failing to

adequately train and supervise members to prevent the drugging of women present at fraternity functions where alcohol was being served; hosting an event without authorization or compliance with the University's alcohol policies and laws of the state of Rhode Island; and failing to adequately address repeated violations of the Student Code of Conduct and laws of the state of Rhode Island by members.

157.    As a direct and proximate result of Defendants' conduct, Ms. Doe sustained injuries while attending the event at Sears House and thereafter, including but not limited to the physical harm of impairment and sexual assault, and the continuing emotional harm of the trauma she experienced.

## COUNT SIX

### Assault and Battery against Defendant Smith

158.    Plaintiff incorporates all preceding paragraphs into this Count by reference as though fully stated herein.

159.    Defendant Smith engaged in a physical act of a threatening nature by providing a beverage to Ms. Roe and Ms. Doe that contained a substance capable of inducing impairment and incapacitation of their physical and neurological faculties, which in fact occurred.

160.    As a result of these acts, the Plaintiff suffered serious physical harm. Immediately after consuming the beverage and for hours thereafter, she experienced physical impairments, loss of memory, and loss of coordination.  In this state, the Plaintiff was made vulnerable to the sexual assault of another classmate, and was rendered incapable of protecting herself from his unwelcome sexual contact.

161.    In addition to this physical harm, Plaintiff experienced severe psychological and emotional harm as a result of Defendant Smith's assault and battery.  She suffered a frightening

and disorienting loss of cognitive function after ingesting the drink provided by the Defendant Smith, and was unable to safely navigate her surroundings for hours thereafter on that night.  Her incapacitation facilitated her sexual assault, rendering her unable to consent, actively resist, interrupt, or even move during this unwanted and unwelcome sexual contact.

162.    As a direct and proximate result of Defendant Smith's conduct, Ms. Doe sustained injuries while attending the event at Sears House and thereafter, including but not limited to the physical harm of impairment and foreseeable sexual assault, and the continuing emotional harm of the trauma she experienced.

## **REQUESTED RELIEF**

WHEREFORE, Plaintiff Doe prays this court for the following relief:

1.      Enter a judgment in Plaintiff Doe's favor and against Defendant Brown University for discrimination on the basis of sex in violation of Title IX, 20 U.S.C. § 1681;

2.      Enter a judgment in Plaintiff Doe's favor and against Defendant Brown University for retaliation in violation of Title IX, 20 U.S.C. § 1681;

3.      Enter a judgment in Plaintiff Doe's favor and against Defendant Brown University for negligence in violation of the common law of Rhode Island;

4.      Enter a judgment in Plaintiff Doe's favor and against Defendants Brown University and Phi Psi for premises liability in violation of the common law of Rhode Island;

5.      Enter a judgment in Plaintiff Doe's favor and against Defendant John Smith for assault and battery in violation of the common law of Rhode Island;

6.      Award Plaintiff Doe compensatory damages in an amount to be proven at trial for the pain and suffering, damage to education, career, and loss of enjoyment of life that she has experienced as a result of Defendants' unlawful conduct;

7.      Award Plaintiff Doe punitive damages in an amount to be proven at trial;

8.      Award reasonable attorneys' fees, litigation expenses, and costs; and

9.      Grant such other and further relief and the Court may deem appropriate.

/s/ Miriam Weizenbaum
_____
Miriam Weizenbaum (#5182)
Amato A. DeLuca (#0531)
Shad Miller (#8594)
DeLuca & Weizenbaum, Ltd.
199 North Main Street
Providence, RI 02903
401-354-7233
401-453-1501
miriam@delucaandweizenbaum.com
bud@delucaandweizenbaum.com
shad@delucaandweizenbaum.com

*Attorneys for Plaintiff*

Of Counsel:
Debra S. Katz
Lisa J. Banks
Hannah Alejandro
Katz, Marshall & Banks, LLP
1718 Connecticut Ave., NW
Sixth Floor
Washington, D.C. 20009
(202) 299-1140
(202) 299-1148
katz@kmblegal.com
banks@kmblegal.com
alejandro@kmblegal.com

Dated: October 13, 2016

## <u>JURY DEMAND</u>

Plaintiff requests trial by jury as to all issues in this case.


/s/ Miriam Weizenbaum

_____

Miriam Weizenbaum (#5182)
Amato A. DeLuca (#0531)
Shad Miller (#8594)
DeLuca & Weizenbaum, Ltd.
199 North Main Street
Providence, RI 02903
401-354-7233
401-453-1501
miriam@delucaandweizenbaum.com
bud@delucaandweizenbaum.com
shad@delucaandweizenbaum.com

*Attorneys for Plaintiff*


Of Counsel:
Debra S. Katz
Lisa J. Banks
Hannah Alejandro
Katz, Marshall & Banks, LLP
1718 Connecticut Ave., NW
Sixth Floor
Washington, D.C. 20009
(202) 299-1140
(202) 299-1148
katz@kmblegal.com
banks@kmblegal.com
alejandro@kmblegal.com

Dated: October 13, 2016