UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                        )
JANE DOE,                               )
                                        )
          Plaintiff,                    )     C.A. No. 16-562 WES
                                        )
     v.                                 )
                                        )
                                        )
BROWN UNIVERSITY; PHI KAPPA PSI,        )
INC.; JOHN SMITH; PHI KAPPA PSI-        )
RHODE ISLAND ALPHA CHAPTER              )
PRESIDENT R.H.; PHI KAPPA PSI-          )
RHODE ISLAND ALPHA CHAPTER              )
SECRETARY 1; PHI KAPPA PSI-RHODE        )
ISLAND ALPHA CHAPTER PRESIDENT          )
J.P.; and PHI KAPPA PSI-RHODE           )
ISLAND ALPHA CHAPTER SECRETARY 2,       )
                                        )
          Defendants.                   )
_____)

**MEMORANDUM AND ORDER**

WILLIAM E. SMITH, Chief Judge.

     This case is before the Court on motions from Defendants John

Smith (ECF Nos. 40, 41), Phi Kappa Psi, Inc., ("PKP") (ECF Nos.

50, 51), and Brown University ("Brown" or "University") (ECF No.

65), variously attacking Plaintiff Jane Doe's Second Amended

Complaint ("SAC") (ECF No. 39). After a brief overview of the

alleged facts, the Court considers and denies all but part of

Brown's Motion for Judgment on the Pleadings and part of Defendant

John Smith's Motion to Dismiss.

I.  Background[1]

As alleged in the SAC, on October 17, 2014, Doe attended a party hosted by the members of Phi Kappa Psi – Rhode Island Alpha Chapter ("Alpha Chapter") at the fraternity's residence on the Brown campus. Then a junior at Brown, Doe arrived at the party with her friend, Mary Roe, who soon found herself in conversation with John Smith. Eventually Smith offered Roe a drink. Roe assented, but requested a drink that would not aggravate one of her myriad food allergies.

Smith obliged, mixing an ostensibly hypoallergenic cocktail, out of the view of Doe and Roe. Roe took a sip and handed the drink to Doe who also partook before handing the drink back to Roe to finish. Both women soon entered something of a fugue, experiencing a loss of motor function, cognitive awareness, and memory. After they became separated as a result of their disorientation, Doe stumbled into Michael Jones, a Brown student she had met once before. In the early hours of October 18, 2014, Jones led Doe to her dormitory room and had sex with her while she lay incapacitated.

---

[1] As it must, this section presents Doe's rendering of the facts. See Arruda v. Sears, Roebuck & Co., 310 F.3d 13, 18 (1st Cir. 2002) (Motions to dismiss require courts to "assume the truth of all well-pleaded facts and indulge all reasonable inferences therefrom that fit the plaintiff's stated theory of liability.").

The next morning Doe sought medical treatment at Brown University Health Services ("Health Services"), where she requested testing for ingestion of date-rape drugs. Dr. Marsha Miller at Health Services took blood and urine samples and sent them to the Rhode Island Hospital Toxicology Laboratory. On October 27, 2014, Dr. Miller informed Plaintiff that her samples had tested positive for gamma-Hydroxybutyric acid ("GHB").

In response to the positive test and a formal complaint filed with Brown by Doe, the University opened three disciplinary proceedings, one each against Alpha Chapter, Jones, and Smith. On December 10, 2014, Brown's Student Conduct Board found the fraternity "Responsible" for charges that included illegal possession or use of drugs; illegal provision, sale, or possession with intent to sell drugs; and actions that result in or can be reasonably expected to result in physical harm to a person. And on December 22, 2014, the Student Conduct Board found Jones "Not Responsible" on two sexual misconduct charges.

Brown set the disciplinary hearing regarding Smith's conduct for December 19, 2014. But on December 15 the hearing was enjoined by court order. In January, through no fault of her own, there appeared reason to doubt much of the physical evidence supporting Doe's claims: A toxicology analysis of Roe's hair came back negative for GHB. A report by Dr. David Greenblatt (who had been retained by Smith) concerning the toxicology testing of Doe's urine

sample concluded that such testing produced invalid results. The University's own expert, Dr. Guy Vallaro, agreed with Dr. Greenblatt as to the invalidity of the urine sample, and also found that the testing of Doe's blood sample and of Roe's hair sample had been faulty, producing inconclusive results.

News of the invalid tests led University Provost Joseph Meisel to reduce the penalty previously handed down to Alpha Chapter, and the University dropped its disciplinary proceeding against Smith.[2] Ruling on Doe's appeal, Dr. Meisel also upheld the Student Conduct Board's "Not Responsible" determination as to Jones. All three determinations were made despite the Provost's continued belief, based on the witness testimony in the Alpha Chapter proceeding, that Doe and Roe had been given a substance that incapacitated them.

Doe appealed the University's decision to drop its investigation into Smith, which the University denied. Doe suspects this decision was part of an effort on Brown's part to shield Smith – the son of a University Trustee – from investigation. As grounds for this suspicion, Doe notes that the University rejected receipt of evidence that Smith was running a false-identification business, and that University officials had

---

[2] Brown also issued notice to the campus community that it would no longer use the laboratories to which it sent Doe's samples.

previously told Doe that Smith's disciplinary hearing would continue regardless of the toxicology results.

Emboldened by what they considered their successful defense of Doe's complaints against them, Alpha Chapter and Smith began intimidating Doe, with impunity. For instance, despite the University withdrawing its recognition of Alpha Chapter, the fraternity went on to recruit new members and gather at the fraternity house. The purpose of one such gathering was raising the fraternity's flag in counter-protest as a group of Brown students marched through campus against the University's handling of Doe's and Roe's cases. There was also an incident where Alpha Chapter distributed leaflets on campus that disclosed confidential information regarding Doe's allegations. For his part, Smith began staying overnight in Doe's dormitory in violation of a "No Contact" order, a situation that made Doe uncomfortable.

Not only did the University stand by as others moved against her, it also denied her an interview to Brown's medical school – even though Doe was, on paper, one of Brown's best students, and was ultimately offered admission by many other top medical schools. Doe believes that Brown's decision was not on the merits, but rather retaliation for Doe's vigorous assertion of her rights throughout the University's investigations.

II. Discussion

Doe brings claims against Brown for discrimination (count one) and retaliation (count two) in violation of Title IX. She also charges the University with negligence (counts three and four). Doe's claims against PKP (count five) and Alpha-Chapter representatives (counts four and five) sound in negligence. And finally, Doe sues Smith for assault and battery (count six).

Doe asks for damages to compensate her for the severe emotional harm she allegedly experienced as a result of the incident at Alpha Chapter's party and Brown's conduct during its investigation of the incident. Doe claims that her compromised emotional state disrupted her studies, extracurricular activities, and overall enjoyment of campus life. She also asks for punitive damages.

As mentioned above, and discussed below, Defendants have variously challenged the SAC. Some of these challenges succeed; most do not.

A.    Brown University's Motion for Judgment on the Pleadings

Brown moves for judgment on the pleadings as to counts one, two, three, and four of Doe's SAC. "The standard of review of a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is the same as that for a motion to dismiss under Rule 12(b)(6)." <u>Frappier v. Countrywide Home Loans, Inc.</u>, 750 F.3d

91, 96 (1st Cir. 2014) (quotation marks omitted). So, the Court will view "the facts contained in the pleadings in the light most favorable to the nonmovant and draw all reasonable inferences therefrom," and then decide whether the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." In re Loestrin 24 Fe Antitrust Litig., 814 F.3d 538, 549 (1st Cir. 2016) (alteration and quotation marks omitted).

### 1. Count One: Title IX Discrimination

Count one alleges Title IX discrimination against Brown. Under Title IX, "recipients of federal funding may be liable for 'subject[ing]' their students to discrimination where the recipient is deliberately indifferent to known acts of student-on-student sexual harassment and the harasser is under the school's disciplinary authority." Davis v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 646-47 (1999) (alteration in original).

That is, funding recipients like Brown may be liable under Title IX "only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Id. at 648. In order to prevail under this Title IX theory, "a plaintiff must establish sexual harassment of students that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal

access to an institution's resources and opportunities." Id. at 651.

The First Circuit has developed a five-part test for Title IX liability in cases of student-on-student harassment. Porto v. Town of Tewsbury, 488 F.3d 67, 72-73 (1st Cir. 2007). These cases require a plaintiff to show:

> (1) that he or she was subject to severe, pervasive, and objectively offensive sexual harassment by a school peer, . . . (2) that the harassment caused the plaintiff to be deprived of educational opportunities or benefits . . . (3) [and that the funding recipient] knew of the harassment, (4) in its programs or activities and (5) it was deliberately indifferent to the harassment such that its response (or lack thereof) is clearly unreasonable in light of the known circumstances.

Id. (quotation marks omitted).

Moreover, "[i]f an educational institution takes 'timely and reasonable measures to end the harassment, it is not liable under Title IX for prior harassment.' However, if earlier measures have proved inadequate to prevent further harassment, a school 'may be required to take further steps to avoid new liability.'" Doe v. Emerson Coll., Civil Action No. 14-14752-FDS, 2017 WL 4273301, at *15 (D. Mass. Sept. 26, 2017) (quoting Wills v. Brown Univ., 184 F.3d 20, 26 (1st Cir. 1999)).

There is no denying that Brown responded to Doe's complaints, and that at least from a certain vantage, its response was arguably far from perfunctory. Indeed, even in Doe's telling the University's response included collecting blood and urine samples

to test for the date-rape drugs GHB and flunitrazepam; issuing statements to the Brown community regarding Doe's allegations and findings Brown made during its investigation of those allegations; conducting disciplinary proceedings against Alpha Chapter and Jones; and imposing a sanction on Alpha Chapter that withdrew its university recognition for two-and-a-half years.

But the law makes plain that a response to Doe's complaints does not, by itself, shield Brown from liability under Title IX; the nature of the response matters. See Brodeur v. Claremont Sch. Dist., 626 F. Supp. 2d 195, 210 (D.N.H. 2009) ("A 'school's investigation, though promptly commenced . . . may be carried out so inartfully as to render it clearly unreasonable.'" (quoting Fitzgerald v. Barnstable Sch. Comm., 504 F.3d 165, 175 (1st Cir. 2007), rev'd on other grounds, 555 U.S. 246 (2009))); Emerson Coll., 2017 WL 4273301, at *15 ("Under some circumstances, an educational institution's failure to adequately respond to complaints of sexual harassment may constitute deliberate indifference."); Leader v. Harvard Univ. Bd. of Overseers, Civil Action No. 16-10254-DJC, 2017 WL 1064160, at *4 (D. Mass. Mar. 17, 2017) ("[W]hile an institution that takes timely and reasonable measures to end the harassment . . . is not liable under Title IX for prior harassment, the institution may still be liable under Title IX if those measures fail to solve the problem.") (quotation marks omitted).

Furthermore, if a university "learns that its measures have proved inadequate, it may be required to take further steps to avoid new liability." Leader, 2017 WL 1064160, at *4 (quotation marks omitted); see Vance v. Spencer Cty. Pub. Sch. Dist., 231 F.3d 253, 261 (6th Cir. 2000) (concluding that "[w]here a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances"); cf. Wills, 184 F.3d at 26 ("[E]vidence of an inadequate response is pertinent to show fault and causation where the plaintiff is claiming that she was harassed or continued to be harassed after the inadequate response.").

And in fact, here Doe alleges that Brown's investigation was bungled, and in a way that led to further harassment. For example, Doe alleges that Brown routinely sent blood and urine samples to a laboratory incapable of conducting definitive tests for date-rape drugs – despite Brown's knowledge that other female students reported being drugged at campus events. Moreover, Doe alleges that by sending samples to an ill-equipped laboratory, Brown in effect lost evidence that may have supported her complaint against Smith.

Without this evidence, according to Doe, Brown had an easier time convincing the campus community and general public that its reason for discontinuing its disciplinary process concerning Smith

was a lack of evidence, and not in furtherance of a secret design to drop the case as a favor to Smith's father, a University trustee – a decision that was at least curious given that Brown officials had found in the proceedings against Alpha Chapter that Smith had spiked Doe's drink.

The Court finds that these allegations – again, taken as true, and in the light most favorable to Doe – make out a plausible claim that Brown's response was "carried out so inartfully as to render it clearly unreasonable." Brodeur, 626 F. Supp. 2d at 210. Especially when the Court considers Doe's claim that the harassment negatively affected her educational opportunities. See Hunter v. Barnstable Sch. Comm., 456 F. Supp. 2d 255, 263 (D. Mass. 2006) ("Sexual harassment will reach the severity or pervasiveness required for a viable Title IX claim where it adversely affects the victim's educational opportunities."). And her assertion that Brown's mishandling of physical evidence caused her to endure further harassment, including an incident where Alpha Chapter distributed leaflets to the University community that disclosed confidential information regarding Doe's allegations.

### 2.   Count Two: Title IX Retaliation

Count two of the SAC alleges a Title IX retaliation claim against Brown. A plaintiff may establish a prima facie case for a retaliation claim by alleging facts sufficient to show that "she engaged in activity protected by Title IX, that the alleged

11

retaliator knew of the protected activity, that the alleged retaliator subsequently undertook some action disadvantageous to the actor, and that a retaliatory motive played a substantial part in prompting the adverse action." Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 67 (1st Cir. 2002).

In her SAC, Doe contends that after she complained to Brown about the alleged drugging and sexual assault, the University denied her a medical school interview in retaliation for her complaints. Doe has therefore alleged that she engaged in activity protected by Title IX that the retaliator knew about. See Minnis v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll. 620 F. App'x. 215, 222 (5th Cir. 2015) (protected activity includes making complaints "related to gender inequality"). Further, Doe claims that Brown, with retaliatory intent, subsequently denied her an interview, while "higher-ranked" schools not only interviewed but accepted her.

The Court finds that Doe has made out a prima facie Title IX retaliation claim. See Fox v. Town of Framingham, Civil No. 14-CV-10337-LTS, 2016 WL 4771057, at *7 (D. Mass. Sept. 13, 2016) ("In a retaliation case, a plaintiff need only show that a reasonable [student] would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable [student] from making or supporting a charge

of discrimination." (quoting Rodríguez-Vivez v. P.R. Firefighters Corp. of P.R., 743 F.3d 278, 284 (1st Cir. 2014))).

### 3. Count Three: Negligence

In count three, Doe alleges that Brown was negligent in its handling of the physical evidence related to her case, resulting in "significant emotional harm." In its motion for judgment on this count, Brown assumes, _arguendo_, that it has a duty to adequately collect, maintain, and test samples provided in cases of suspected drugging and sexual assault. But the University argues, correctly, that because Doe does not allege she suffered any physical harm as a result of Brown's alleged mistreatment of the physical evidence in her case, her claim is one for negligent infliction of emotional distress. See Frisina v. Women and Infants Hosp. of R.I., No. CIV. A. 95-4037, 2002 WL 1288784, at *3 (R.I. Super. Ct. May 30, 2002) ("Mental anguish or emotional distress claims can fall into one of two categories: either negligent infliction of emotional distress or intentional infliction of emotional distress.").

And under Rhode Island law, this type of claim is limited to two groups, neither of which includes Doe. See Perrotti v. Gonicberg, 877 A.2d 631, 636 (R.I. 2005) ("Only two groups of plaintiffs are able . . . to seek recovery under a theory of negligent infliction of emotional distress: those within the 'zone-of-danger' who are physically endangered by the acts of a

negligent defendant, and bystanders related to a victim whom they witness being injured." (quotation marks omitted)). Doe's negligence claim based on Brown's handling of physical evidence is therefore dismissed.

Doe also alleges in count three that Brown was negligent in its supervision of Alpha Chapter. This claim fails, Brown argues, because the university-student relationship is not the type of "special relationship" that may qualify for an exception to the general rule that "a landowner has no duty to protect another from harm caused by the dangerous or illegal acts of a third party." Martin v. Marciano, 871 A.2d 911, 915 (R.I. 2005); see, e.g., Karasek v. Regents of Univ. of Cal., Case No. 15-cv-03717-WHO, 2015 WL 8527338, at *20 (N.D. Cal. Dec. 11, 2015) ("California courts have repeatedly held that a university does not have a special relationship with its students such that it may be held liable for failing to protect them from the wrongful acts of third parties."); Hernandez v. Baylor Univ., 6:16-CV-69-RP, 2017 WL 1322262, at *10 (W.D. Tex. Apr. 7, 2017) ("Courts across the country have determined . . . that the general foreseeability of sexual assault on campus is insufficient to warrant negligence liability [against universities].").

Under Rhode Island law, "[a] special relationship, when derived from common law, is predicated on a plaintiff's reasonable expectations and reliance that a defendant will anticipate harmful

acts of third persons and take appropriate measures to protect the plaintiff from harm." <u>Martin</u>, 871 A.2d at 915 (quotation marks omitted); <u>see</u> <u>Ferreira v. Strack</u>, 652 A.2d 965, 967-68 (R.I. 1995) (finding that social host owed no duty of care to "an innocent third party who suffers injuries as a result of the negligent operation of a motor vehicle by an adult guest if the negligence is caused by the guest's intoxication.").

The <u>Ferreira</u> court found no duty in part because holding social hosts liable for their guests' torts would have "such serious implications that any action taken should be taken by the Legislature after careful investigation, scrutiny, and debate." <u>Ferreira</u>, 652 A.2d at 968. The Court finds that similarly serious implications would attend holding universities like Brown liable for the torts of their students. Therefore, discretion dictates dismissing this claim; any change in this area of third-party liability law must come from the legislature.

4.    Count Four: Premises Liability

Count four alleges premises liability against Brown based on the University's ownership of Sears House, which served as campus residence for Alpha Chapter, and where Doe was allegedly drugged. The law of premises liability "imposes an affirmative duty upon owners and possessors of property: to exercise reasonable care for the safety of persons reasonably expected to be on the premises includ[ing] an obligation to protect against the risks of a

dangerous condition existing on the premises, provided the landowner knows of, or by the exercise of reasonable care would have discovered, the dangerous condition." Correia v. Bettencourt, 162 A.3d 630, 637 (R.I. 2017) (quotation marks omitted).

The Court finds that the same sweeping social implications that have made the judiciary hesitate to hold universities liable under the special-relationship theory (discussed above) counsel similar caution as to Doe's premises-liability theory. See Bucki v. Hawkins, 914 A.2d 491, 495-96 (R.I. 2007) (finding that one factor to consider in determining whether a duty exists under premises-liability theory is "the extent of the burden to the defendant and the consequences to the community for imposing a duty to exercise care with resulting liability for breach.") (quotation marks omitted)).

Moreover, the dangerous condition that allegedly hurt Doe – a spiked drink at the fraternity – is not something Doe plausibly alleges that Brown knew of or should have reasonably discovered. See id. at 495 ("foreseeability of harm to the plaintiff" also a consideration in duty-of-care analysis in premises-liability cases). While Doe asserts that in the span of approximately four years the University charged Alpha Chapter with five disciplinary infractions involving unregistered parties and serving alcohol to minors, this does not make what allegedly happened to Doe reasonably foreseeable. See, e.g., Facchetti v. Bridgewater Coll.,

175 F. Supp. 3d 627, 644 (W.D. Va. 2016) (finding no duty of care existed between college and student where five assaults in college's dormitories occurred in the year prior). As the Facchetti court found, a college's awareness of five assaults in the past year, "none of which are alleged to have been perpetrated by [alleged assailant], simply do not create the . . . level of foreseeability of harm" necessary for a viable premises-liability claim. Id. The same is true here where the prior charges against Alpha Chapter and its members were not for drugging its guests, or for sexual assault.

B. PKP's Motion to Dismiss

PKP moves to dismiss count five of the SAC, which claims PKP negligently failed to take reasonable steps to control the dangerous behavior of Alpha-Chapter members. PKP argues that count five should be dismissed because PKP owed Doe no duty of care. Doe responds that her complaint contains enough factual matter to make the existence of a duty of care plausible, and therefore PKP's motion should be denied. The Court sides with Doe.

In order to survive PKP's motion, Doe's complaint "must contain sufficient factual matter to state a claim to relief that is plausible on its face." Rodríguez-Reyes v. Molina-Rodríguez, 711 F.3d 49, 53 (1st Cir. 2013) (quotation marks omitted). The factual matter in the SAC relevant to count five against PKP includes the following:

PKP "provided for the existence and recognition of [Alpha Chapter]" which was "a prerequisite for Alpha Chapter's eligibility to administer Program Housing at Sears House on the campus of Brown University."

PKP "authorized and supervised the operation of [Alpha Chapter]."

PKP "exercise[d] control over [Alpha Chapter] . . . and [its] individual members."

PKP "had . . . the authority to discipline [Alpha Chapter] and to revoke its charter."

Study data show that "sexual assault is endemic on college campuses"; "that the most significant risk factor for campus sexual assault is the use of alcohol"; that "[f]raternities pose . . . [a] well-known risk factor for campus sexual assault of women with fraternity members being statistically more likely than non-members to commit assaults against female students"; and that "[f]raternity members are twice as likely to use incapacitation by alcohol or other substances to facilitate sexual assault of women rather than direct physical force."

Alpha Chapter "had a reputation on campus . . . of being a source for the purchase of illegal drugs, including . . . hallucinogenic substances."

"Between 2011 and the unregistered party on October 17, 2014, [Alpha Chapter] was charged in five disciplinary cases, involving unregistered parties, serving alcohol to minors, misconduct by members, and property damage." PKP "was aware of the disciplinary measures taken by Brown University against [Alpha Chapter]."

In response to known risks surrounding fraternities, alcohol, and sexual assault, PKP "issue[d] risk management policies to all local chapters concerning the use of alcohol and drugs, and the prevention of sexual assault."

Under Rhode Island law, "[t]o prevail on a claim of negligence, a plaintiff must establish a legally cognizable duty

owed by a defendant to a plaintiff, a breach of that duty, proximate causation between the conduct and the resulting injury, and the actual loss or damage." Ouch v. Khea, 963 A.2d 630, 633 (R.I. 2009) (quotation marks omitted).

Although the question whether a duty exists is one of law, "there is no clear-cut formula to determine whether a duty exists in a specific case." Id. "Instead, the court will employ an ad hoc approach that turns on the particular facts and circumstances of a given case, taking into consideration all relevant factors, including the relationship between the parties, the scope and burden of the obligation to be imposed upon the defendant, public policy considerations, and the foreseeability of harm to the plaintiff." Id. (quotation marks omitted).

Rhode Island courts emphasize the foreseeability prong of this inquiry. See Selwyn v. Ward, 879 A.2d 882, 887 (R.I. 2005) ("The linchpin in the analysis of whether a duty flows from a defendant to a plaintiff is foreseeability."). Rhode Island borrows its formulation of foreseeability from the famous Palsgraf case:

> As Justice Cardozo of the New York Court of Appeals said: "The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension." Palsgraf v. Long Island R.R. Co., 162 N.E. 99, 100 (N.Y. 1928). This Court has expressed this concept of limiting the scope of a defendant's duty according to risks he or she reasonably perceived, saying that a duty must be

>     based on conduct sufficiently likely to result in the
>     kind of harm suffered by the plaintiff . . . .

Id. (citation and quotation marks omitted).

PKP points to two Indiana Supreme Court cases wherein the court found there was no duty of care running from a national fraternity to third parties harmed by fraternity members. See generally Smith v. Delta Tau Delta, Inc., 9 N.E.3d 154 (Ind. 2014); Yost v. Wabash Coll., 3 N.E.3d 509 (Ind. 2014). But as Doe notes, both cases were decided against the plaintiff at the summary-judgment, not the motion-to-dismiss, stage. So while Doe's claim may meet the same fate as her counterparts' in Yost and Smith, the Court finds that she has pled enough factual matter to make her negligence claim plausible, especially given Rhode Island's duty-of-care analysis "that turns on the particular facts and circumstances of a given case." Carlson v. Town of South Kingstown, 131 A.3d 705, 708-09 (R.I. 2016) (noting that Rhode Island courts have "frowned upon the disposition of negligence claims by summary judgment" (quotation marks omitted)).

Moreover, even though the Indiana Supreme Court has on two occasions found that there was no duty of care owed by national fraternity organizations, Rhode Island courts have yet to decide the issue, and other courts have disagreed with those in Indiana. See, e.g., Brown v. Delta Tau Delta, 118 A.3d 789, 796 (Me. 2015) (holding that national fraternity had duty of care where "it is

certainly foreseeable that turning a fraternity house over to college students, where parties and alcohol-related events are likely to occur, creates the potential for sexual misconduct – a known safety issue on college campuses"); Grenier v. Comm'r of Transp., 51 A.3d 367, 388 (Conn. 2012) (affirming denial of summary judgment where plaintiff's negligence claims against national fraternity raised a genuine issue of material fact, and finding that "whether a national fraternity may be held liable for the actions of one of its local chapters depends both on its ability to exercise control over the local chapter as well as its knowledge either that risk management policies are not being followed or that the local chapter is engaging in inappropriate behavior").[3]

C.    Smith's Motion to Dismiss

Defendant Smith moves to dismiss Doe's assault and battery claims. Smith argues that there can be no assault where, as here, the plaintiff had no apprehension of an injury before that injury

---

[3] The Court notes that there is some similarity between the premises-liability claim against Brown and the negligence claim against PKP. However, dismissing the former while allowing the latter to proceed is the result of Brown's being further removed from Doe's alleged injury. See Bucki, 914 A.2d at 496 (noting "the closeness of connection between the defendant's conduct and the injury suffered" as factor in duty-of-care analysis). The allegations, after all, are that PKP supervised and had control over Alpha Chapter and its individual members. The relative closeness between PKP's alleged conduct and the alleged injury nudges Doe's claim against the fraternity "across the line from conceivable to plausible." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

occurred. He argues that Doe's battery claim must be dismissed because (1) there is no medical evidence that an offensive touching occurred; (2) there is no evidence from which intent to injure can be inferred; and (3) Doe has not pleaded fraud with particularity.

The Court dismisses Doe's assault claim. In Rhode Island, "[a]n assault is a physical act of a threatening nature or an offer of corporal injury which puts an individual in reasonable fear of imminent bodily harm. It is a plaintiff's apprehension of injury . . . which renders a defendant's act compensable." Hennessey v. Pyne, 694 A.2d 691, 696 (R.I. 1997) (citations and quotation marks omitted) (finding that claim of assault will not lie where plaintiff was unaware of errant golf ball before it struck her).

Doe argues that she was put in reasonable fear of imminent bodily harm after she had sipped the allegedly adulterated beverage. But by then the battery, if one there was, had already been committed – the golf ball had already struck her. There is no allegation that Doe was in fear of harmful or offensive bodily contact before such contact occurred. See Restatement (Second) of Torts § 21 (Am. Law Inst. 1965) ("An actor is subject to liability for another for assault if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) the other is thereby put in such imminent apprehension."); see also Geiger v. Bowersox, 974 S.W.2d 513, 516 (Mo. Ct. App. 1998)

(dismissing assault claim where plaintiff had not alleged "fear of imminent peril" prior to ingesting what he thought was medicine, but was in fact floor wax). Doe's alleged fear of some future harm resulting from her inability to protect herself while inebriated does not save her claim: Any fear of this sort was not of contact imminent enough to support an assault claim. See Restatement (Second) of Torts § 29 (Am. Law Inst. 1965) ("The apprehension created must be one of imminent contact, as distinguished from any contact in the future.").

Doe's battery claim, on the other hand, survives. Rhode Island law defines battery as "an act that was intended to cause, and in fact did cause, an offensive contact with or unconsented touching of or trauma upon the body of another." Hennessey, 694 A.2d at 696 (citations omitted). "An intent to injure plaintiff, however, is unnecessary in a situation in which a defendant willfully sets in motion a force that in its ordinary course causes the injury." Id. (quotation marks omitted).

Doe alleges that Smith intentionally mixed then served a drink that caused her harmful mental and physical effects. Cf. Snouffer v. Snouffer, No. 92 CA 499, 1993 WL 248603, at *4 (Ohio Ct. App. July 9, 1993) ("The administration of poison to a person generally constitutes a battery.") (citing 6 Am. Jur. 2d Assault & Battery § 113 (1963)). Notwithstanding Smith's argument to the contrary,

the dearth of medical evidence supporting Doe's claim does not doom it at this stage.

Moreover, Smith's argument that there can be no battery where there is no allegation Smith specifically intended the drink for Doe is unavailing. Under Rhode Island law, it is "not necessary that defendant intend to injure plaintiff. To constitute a battery, it is enough to set in motion willfully a force that in its ordinary course causes an injury." Proffitt v. Ricci, 463 A.2d 514, 518 (R.I. 1983). Doe alleges that Smith willfully spiked the drink he made for Doe's friend. Once set in motion, this force could reasonably be expected to find Doe's lips, causing injury in its ordinary course.

Finally, Smith's attempt to convert Doe's battery claim into one for fraud that is subject to the heightened pleading standards required by Federal Rule of Civil Procedure 9 is without merit. See Connectu LLC v. Zuckerberg, 522 F.3d 82, 93 (1st Cir. 2008) ("[T]he plaintiff is both the author and the master of its complaint. As such, it has the power to decide what law [it] will rely upon. We think that principle extends to a plaintiff's decision as to which causes of action to bring . . . ." (citation omitted)). Doe has pled the law she believes applies to her claims; she has not pled fraud, and therefore the heightened pleading standard applicable to fraud claims does not apply.

D.   PKP's and Smith's Motions to Strike

PKP and Smith move to strike certain parts of the SAC. A party may move pursuant to Federal Rule of Civil Procedure 12(f) to strike "from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Rule 12(f) is designed to reinforce the requirement in Rule 8(e) that pleadings be simple, concise, and direct." Fundi v. Citizens Bank of R.I., No. CA 07-078 ML, 2007 WL 2407106, at *3 (D.R.I. Aug. 22, 2007) (citations omitted).

But "while ruling on a motion to strike is committed to the district court's sound judgment, such motions are narrow in scope, disfavored in practice, and not calculated readily to invoke the court's discretion. This is so because striking a portion of a pleading is a drastic remedy and . . . it is often sought by the movant simply as a dilatory or harassing tactic." Manning v. Bos. Med. Ctr. Corp., 725 F.3d 34, 59 (1st Cir. 2013) (citation and quotation marks omitted).

1.   PKP's Motion

PKP wants stricken three paragraphs in Doe's complaint that refer to studies that estimate the prevalence of sexual assault on college campuses, and that describe how alcohol and fraternities have contributed to these assaults. PKP argues that such information is not relevant to Doe's claims, and in the

alternative, that to the extent such information is relevant, it is nevertheless unduly prejudicial.

PKP's arguments fail because, as Doe points out, data on the prevalence of campus sexual assault are relevant to, among other things, establishing the duty of care for her negligence claim against PKP. <u>See</u> <u>Ouch</u>, 963 A.2d at 633 ("To prevail on a claim of negligence, a plaintiff must establish a legally cognizable duty owed by a defendant to a plaintiff, a breach of that duty, proximate causation between the conduct and the resulting injury, and the actual loss or damage." (citations omitted)). The prevalence of sexual assault on college campuses, and the extent to which such is facilitated by alcohol served at fraternities, is relevant to the foreseeability of Doe's alleged harm. <u>See</u> <u>id</u>. (finding that Rhode Island courts use an ad hoc approach to determining whether a duty of care exists, which turns on, among other things, "the foreseeability of harm to the plaintiff").

Moreover, PKP's arguments that these data may not be admissible are insufficient to support a Rule 12(f) motion to strike. <u>See</u> <u>Sheffield v. City of Boston</u>, 319 F.R.D. 52, 54 (D. Mass. 2016) ("[I]nadmissibility is insufficient to support a Rule 12(f) motion."). Also deficient is PKP's attempt to use a Rule 12(f) motion to strike Doe's demand for punitive damages. <u>Whittlestone, Inc. v. Handi-Craft Co.</u>, 618 F.3d 970, 974-75 (9th Cir. 2010) ("Rule 12(f) does not authorize district courts to

strike claims for damages on the ground that such claims are precluded as a matter of law.").

       2.   Smith's Motion

Smith moves to strike several paragraphs from Doe's brief that allege Smith operated a fake-identification business out of his residence at Brown. Smith argues that these allegations are immaterial and impertinent to the issues in the case, and that they are unduly prejudicial.

Doe responds that these allegations support her claims insofar as they identify how Smith purchased alcohol for the party, which was the medium through which Smith committed the alleged battery. Doe also claims that the University declined to accept evidence of Smith's business, which, she argues, is evidence for her contention that the University unfairly protected Smith during its investigation of the incident.

The Court recognizes that allegations of running a fake-identification business do not cast Smith in the best light, and are not at the heart of Doe's case. However, Doe has sufficiently demonstrated how these allegations could be relevant to her case. And in any event Smith has not made it "clear that the allegations in question can have no possible bearing on the subject matter of the litigation." Lennon v. Seaman, 63 F. Supp. 2d 428, 446 (S.D.N.Y. 1999) (quotation marks omitted). The Court therefore denies Smith's motion.

III. Conclusion

As set out above, the Court grants in part and denies in part Brown University's Motion for Judgment on the Pleadings (ECF No. 65); denies Phi Kappa Psi, Inc.'s, Motion to Dismiss (ECF No. 50); grants in part and denies in part John Smith's Motion to Dismiss (ECF No. 41); and denies both PKP's (ECF No. 51) and Smith's (ECF No. 40) motions to strike.

IT IS SO ORDERED.

_____
William E. Smith
Chief Judge
Date: January 16, 2018